**BP AMERICA PRODUCTION COMPANY, Atlantic Richfield Company and Vastar Resources, Inc., Petitioners,**

v.

**Stanley G. MARSHALL, Jr., Robert Ray Marshall, Catherine Irene Marshall f/k/a Catherine I.M. Hashmi, and Margaret Ann Marshall f/k/a Margaret A.M. Jeffus, by and through David Jeffus, as Independent Executor of the Estate of Margaret Marshall, Respondents.**

No. 09–0399.

Supreme Court of Texas.

Argued Dec. 7, 2010.

Decided May 13, 2011.

Rehearing Denied July 1, 2011.

Charles G. King, King & Pennington, L.L.P., James P. Pennington, Law Offices of James Pennington, J. Gregory Copeland, Jennifer Hope Naylor Kingaard, Baker Botts L.L.P., Houston, Thomas R. Phillips, Stacy Rogers Sharp, Evan Andrew Young, Baker Botts L.L.P., Austin, for BP America Production Company.

James K. Jones Jr., Edward Frederick Maddox, Jones, Gonzalez & Maddox, An Association, Laredo, Timothy Patton, Timothy Patton, PC, San Antonio, for Stanley G. Marshall, Jr.

Pamela Stanton Baron, Michael E. McElroy, John Michael Quinlan, McElroy Sullivan & Miller, L.L.P., Austin, Arnulfo Gonzalez, Law Offices of Arnulfo Gonzalez, Laredo, for Wagner Oil Company.

David M. Gunn, Beck, Redden & Secrest, L.L.P., Austin, Richard G. Morales Jr., Ricardo E. Morales, Marisela Rangel, Person Whitworth Borchers & Morales LLP, Laredo, Erin H. Huber, Beck, Redden & Secrest, L.L.P., Houston, for Vaquillas Ranch Co., Ltd.

Everard A. Marseglia Jr., Liskow & Lewis, A PLC, Houston, for Amicus Curiae The Texas Oil & Gas Association.

Dee J. Kelly, Kelly Hart & Hallman LLP, Fort Worth, for Amicus Curiae Kelly Hart & Hallman LLP.

Mary A. Keeney, Graves Dougherty Hearon & Moody, P.C., Austin, for Amicus Curiae Texas Land and Mineral Owners Assoc'n.

Justice LEHRMANN delivered the opinion of the Court.

This case involves two related oil and gas mineral lease disputes that were jointly tried. One of the disputes is between petitioners BP America Production Co., Atlantic Richfield Co., and Vastar Resources, Inc. (collectively "BP"), the lessee and operator, and respondents the Marshall family, Stanley, Robert, Catherine, and Margaret Marshall, the lessors. The other is a dispute between BP's successors-in-interest, petitioners Wagner Oil Co. f/k/a Duer Wagner & Co., Jacque Oil & Gas Limited, Duer Wagner, Jr., Duer Wagner III, Bryan C. Wagner, James D. Finley, Dennis D. Corkran, David J. Andrews, H.E. Patterson, Brent Talbot, Scott Briggs, and Gysle R. Shellum (collectively "Wagner"), and another lessor, respondents Vaquillas Ranch Co., Ltd., Vaquillas Unproven Minerals, Ltd., and Vaquillas

Proven Minerals, Ltd. ("Vaquillas") [1]. We are asked to determine whether limitations barred the Marshalls' fraud claim against BP, and whether Vaquillas lost title by adverse possession after Wagner succeeded to BP's interests, took over the operations, and produced and paid Vaquillas royalties for nearly twenty years.

Based in part upon jury findings that BP had made fraudulent representations about its good-faith efforts to develop a well on the Marshall lease that the Marshalls could not have discovered before limitations expired, the trial court rendered judgment for the Marshalls. It also rendered judgment for Wagner that Wagner had acquired the Marshall and Vaquillas leases by adverse possession. The court of appeals affirmed the judgment against BP in most respects, and reversed the trial court's judgment for Wagner. 288 S.W.3d 430, 438. We reverse the court of appeals' judgment and render judgment for Wagner and BP. We hold that because the Marshalls' injury was not inherently undiscoverable and BP's fraudulent representations about its good faith efforts to develop the well could have been discovered with reasonable diligence before limitations expired, neither the discovery rule nor fraudulent concealment extended limitations. Accordingly, the Marshalls' fraud claims against BP were time-barred. We further hold that by paying a clearly labeled royalty to Vaquillas, Wagner sufficiently asserted its intent to oust Vaquillas to acquire the lease by adverse possession.

## I. BACKGROUND

At the time of the dispute, fifty percent of the minerals under 17,712 acres in the Slator Ranch were owned by Tenneco and later assigned to Wagner; the other fifty percent were owned by a number of individuals and entities, including the Marshalls and the Vaquillas companies. The Marshalls owned approximately 1/16 and Vaquillas owned approximately 1/4 of the minerals. In the 1970s, BP [2] obtained oil and gas leases on the Slator Ranch from Tenneco, Vaquillas, the Marshalls, and other mineral owners not party to this dispute. Their leases had a standard sixty-day savings clause providing that the lease would continue past the expiration date so long as BP was engaged in good-faith drilling or reworking operations designed to produce paying quantities of oil or gas with no cessation of operations for more than sixty days.

The primary terms of the Marshalls' and Vaquillas's leases were set to expire on July 11, 1980. Two weeks before the expiration date, BP drilled a well, the J.O. Walker No. 1. BP continued to work on the J.O. Walker No. 1 for the rest of the year, testing several zones in the well. Seeing no production from the well after the lease expiration date, Stanley Marshall, a member of the Marshall family, contacted BP and was informed that the lease was kept alive by continuing operations. A few days later, H.F. Young, the BP landman who spoke with Marshall, sent him a three-page letter purporting to document BP's continuous operations. BP listed a number of activities conducted on J.O. Walker No. 1, implying that good-faith efforts were continuing to invoke the sixty-day savings clause and retain the lease. The Marshalls, satisfied with BP's

1. The following entities submitted amicus briefs: the Texas Oil & Gas Association, Kelly Hart & Hallman LLP, and the Texas Land & Mineral Owners Association.

2. The leases were executed by Atlantic Richfield Co. (ARCO), an entity later acquired by BP. Given the number of entities involved in the dispute, we refer to ARCO as BP to avoid confusion.

response, did not investigate further. During the same period, Vaquillas representatives likewise inquired into the status of its lease, and received a copy of the same letter from Young.

On March 25, 1981, BP entered into a series of agreements with Sanchez–O'Brien Oil & Gas Corporation by which Sanchez–O'Brien eventually became the operator on a portion of the Slator Ranch. The same day, BP decided to permanently plug and abandon the J.O. Walker No. 1 as unproductive. Sanchez–O'Brien drilled its first, undisputedly productive, well in April 1981. Then, in August 1994, Sanchez–O'Brien transferred its portion of the lease through a series of assignments to Fina Oil & Chemical Co., and ultimately to Wagner.

It is undisputed that there have been continuous operations on the lease from the day Sanchez–O'Brien began operations to the present. At the time it obtained assignment of the Marshalls' and Vaquillas's leases from BP, Wagner was already operating in other portions of the Slator Ranch and held leases to fifty percent of the minerals. Wagner regularly paid royalties upon obtaining the assignment.

In 1997, Vaquillas sued its lessee Wagner, BP, and other entities alleging breach of implied covenants to reasonably develop and market hydrocarbons under the lease. During the course of discovery, Vaquillas's experts came to believe that its original lease with BP, Wagner's predecessor-in-interest, terminated in early January 1981 because BP had abandoned any real efforts to rework the well and would not have expected it to produce in paying quantities when it continued operations in February and March. Since drilling on the Sanchez–O'Brien well did not commence until April 13, 1981, more that sixty days later, Vaquillas asserted that the title to the leasehold reverted back to Vaquillas. Vaquillas amended the lawsuit to seek a declaration of title to the mineral interest, contending that Wagner did not have title to the lease because the lease expired before BP transferred its interest in the leasehold to Wagner.

In 2001, the Marshalls intervened in the suit against BP and Wagner, similarly alleging that their lease had terminated in 1981 and adding that BP had defrauded them by purposefully concealing facts and circumstances demonstrating that the lease had already terminated. Vaquillas settled its claims against BP and proceeded to trial only against Wagner. The Marshalls conceded that Wagner's possession of the Marshall and Vaquillas leaseholds during the ten years following the alleged lapse in operations constituted adverse possession and proceeded to trial only on their fraud claims against BP. They contended that because BP fraudulently concealed that the lease had expired, the four-year statute of limitations for fraud claims should be extended to the time they could have reasonably discovered the fraud—June 2000, when BP released internal documents on the J.O. Walker No. 1. The Marshalls argued BP knew by the lease expiration date that the well was incapable of production and continued operations in bad faith until it could sell the lease to Sanchez-O'Brien.

At trial, the jury found in favor of the Marshalls and against BP, and the court rendered judgment on the verdict. The Marshalls were granted: (1) a declaration that the Marshall lease with BP had terminated; (2) a declaration that BP's property interest had terminated and reverted to the Marshalls; (3) a court-ordered accounting and a transfer of an overriding royalty interest; (4) past compensatory damages of $1,127,749.00 for each Marshall family member based upon the jury's fraud finding; (5) attorney's fees; and (6) prejudgment and post-judgment interest.

In the dispute between Vaquillas and Wagner, the jury found that: (1) Wagner had adversely possessed the leasehold; (2) Wagner was a bona fide purchaser; and (3) the failure of Vaquillas to timely file suit against Wagner was not excused. The trial court rendered judgment for Wagner against the Vaquillas Companies and granted a directed verdict for Wagner against the Marshalls, ruling that Wagner had adversely possessed the mineral interest covered by its lease as to the Marshalls.

The court of appeals held there was legally sufficient evidence to support the jury's finding that BP committed fraud against the Marshalls and Vaquillas, both affirmatively and by nondisclosure, and fraudulently concealed the facts necessary for Vaquillas and the Marshalls to know they had a cause of action for fraud until June 29, 2000. 288 S.W.3d at 452. With respect to limitations, the court of appeals reasoned,

> The discovery rule applies only to a limited category of cases, including cases involving fraud or fraudulent concealment. (Citations omitted). Accordingly, BP America's argument based on whether the nature of the injury is inherently discoverable and the injury itself is objectively verifiable is inapplicable. Because BP America does not challenge the jury's finding relating to the date of discovery, which is within the applicable limitations period, we overrule this portion of issue three. We need not address BP America's claim that the Marshalls did not prove fraudulent concealment because the application of the discovery rule alone is sufficient to defeat BP America limitations defense.

288 S.W.3d at 452. The court reversed the judgment awarding title to the leases to Wagner by adverse possession. *Id.* We granted BP's and Vaquillas's petitions for review. 54 Tex.Sup.Ct.J. 1, 2 (Tex. Oct. 4, 2010).

## II. LIMITATIONS

BP challenges the court of appeals' ruling[3] that the Marshalls' fraud claim was not barred by limitations. BP asserts that the court of appeals erred in holding that the discovery rule exception to limitations applied to the Marshalls' claims. We agree that the discovery rule exception did not operate to defer accrual of the cause of action; however, this does not end our analysis. We must also consider whether limitations were tolled by BP's fraudulent concealment of the cessation of good faith operations. We consider each doctrine in turn.

### A. The discovery rule

We have recognized two doctrines that may apply to extend the statute of limitations. *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455–56 (Tex. 1996). Under the first, the discovery rule, the cause of action does not accrue until the injury could reasonably have been discovered. *See id.; S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996) (citing *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex.1994), for the proposition that deferring accrual and thus delaying the commencement of the limitations period differs from suspending or tolling the running of limitations once the period has begun). The discovery rule is applied categorically to instances in which "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is

---

**3.** We address the dispute between BP and the Marshalls first, turning to the dispute between Vaquillas and Wagner in section III.

objectively verifiable." [4] *Altai*, 918 S.W.2d at 456. An injury is not inherently undiscoverable when it is the type of injury that could be discovered through the exercise of reasonable diligence. *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734–35 (Tex.2001). Recognizing the social benefit in granting repose after a reasonable time, we have described the rule as a " 'very limited exception to statutes of limitations.' " *Id.* at 734 (quoting *Altai*, 918 S.W.2d at 455–56).

In *Wagner & Brown*, we held that the discovery rule categorically does not apply to defer the accrual of royalty owners' claims for underpayments. *Id.* at 737. We reasoned that the injury was not inherently undiscoverable because royalty owners can timely discover such injuries through the exercise of due diligence. *Id.* We noted that, even though information that would have revealed the injury may not have been available from public records, it was nevertheless available from several other sources, including the lessee, its general partner, and gas purchasers. *Id.* Similarly, in *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex.1998), we held that the discovery rule does not apply to claims arising from damage to a common oil and gas reservoir. Noting that several sources of information about common reservoirs and operations are available to royalty owners, including Railroad Commission records, we held that such damage is categorically not inherently undiscoverable. *Id.*

Information disclosing a lessee's failure to continue good faith efforts to develop an oil and gas lease is available from the same sources recognized in *Wagner & Brown* and *HECI*, including public records. In this case, the Marshalls' expert testified that he determined BP operations in continuing to rework J.O. Walker No. 1 were not in good faith based on the well log and the plugging report filed with the Railroad Commission within the limitations period. While the J.O. Walker No. 1 well log contained highly technical information regarding the resistivity, conductivity, and spontaneous potential at various intervals in the formation, it was this information regarding the reservoir's geology that led the Marshalls' expert to conclude that BP's continued activities on the well were not in good faith. Although the expert came to this conclusion after being provided with internal BP documents indicating BP's efforts to keep the lease alive, the log and the report were alone sufficient to discover what the expert ultimately concluded— that BP's efforts to obtain production at shallow intervals after other intervals proved unsuccessful were not in good faith. The expert acknowledged that anyone would have been able to obtain copies of the log and the report from the Commission records and reach the same conclusions. Although technical, the public documents concerning BP's operations were available to the Marshalls. While the Marshalls did not examine them until internal

---

4. We have occasionally distinguished between cases involving allegations of "fraud and fraudulent concealment [and cases] to which the discovery rule applies." *See, e.g., S.V. v. R.V.*, 933 S.W.2d at 6. BP reads our decisions to preclude the application of the discovery rule in all fraud cases and argues that the court of appeals therefore erred in its application. We first note that the discovery rule delays the accrual of a cause of action, rather than tolling the statute of limitations after a cause of action has accrued. *See id.* However, because we agree with BP that the discovery rule does not apply to the Marshalls' claim since their injury could have been discovered through the exercise of reasonable diligence, we do not decide whether the discovery rule would prevent accrual of a cause of action in instances where the fraud alleged is not aimed at concealing wrongdoing until limitations has run. *See id.*

BP documents put this publicly available log information in context with BP's efforts to keep the lease alive by continued operations, they could have. It is not significant that BP's internal documents helped the Marshalls discover the injury in this case, as the information was otherwise discoverable. Because the Marshalls had a duty to exercise reasonable diligence in protecting their . mineral interests, and since the low probability of success of BP's continued operations could have been discovered with the exercise of reasonable diligence, the injury was not inherently undiscoverable. *See S.V. v. R.V.*, 933 S.W.2d at 4. Accordingly, the discovery rule did not delay the accrual of the Marshalls' cause of action against BP. *See id.*

## B. Fraudulent concealment

■■ The second doctrine that may extend the limitations period in this case is fraudulent concealment, an equitable doctrine that, unlike the discovery rule, is fact-specific. In this case, the jury found that BP fraudulently concealed the cessation of good faith operations on the J.O. Walker No. 1 well, and that BP also fraudulently concealed the facts necessary for the Marshalls to know they had a cause of action available. It further found that the Marshalls did not have knowledge "that would have required a reasonable and prudent person to make inquiry that … would have led to the discovery of" the cessation or operations or BP's commission of fraud until June 2000.

■■ A defendant's fraudulent concealment of wrongdoing may toll the statute of limitations after the cause of action accrues. *See Kerlin v. Sauceda,* 263 S.W.3d 920, 925 (Tex.2008); *HECI,* 982 S.W.2d at 886. A party asserting fraudulent concealment must establish an underlying wrong, and that "the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff." *Earle v. Ratliff,* 998 S.W.2d 882, 888 (Tex.1999); *Weaver v. Witt,* 561 S.W.2d 792, 793 (Tex.1977) (per curiam). Fraudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence. *Kerlin,* 263 S.W.3d at 925.

The Marshalls argue that only a reasonably diligent inquiry is required, and that they reasonably relied on representations in Young's letter that operations continued in good faith. We disagree. We have repeatedly held that reasonable diligence obliges owners of property interests to make themselves aware of pertinent information available in the public record. For example, in *HECI,* we held that oil and gas lessors had an obligation to exercise reasonable diligence in determining whether adjoining operators had inflicted damage to a common reservoir. 982 S.W.2d at 886. We reasoned that materials publicly available from the Railroad Commission were "a ready source of information" that lessors could have reasonably explored to discover harm inflicted to their property. *Id.* at 887. And in *Kerlin,* we held that a deed holder's descendants who had not received any royalties for minerals on the property, but who had been given notice that deeds executed by their predecessors contained a royalty reservation, could have discovered the existence of their claims for unpaid royalties by investigating public records of case settlements and conveyances. 263 S.W.3d at 926.

Because the Marshalls were obliged to perform additional investigation to protect their interests, if the Marshalls could have discovered BP's wrongdoing by reviewing information available in the public record, or through means other than BP's representations before limitations expired, they did not exercise reasonable diligence in

relying on BP's representations and limitations barred their claim. The Marshalls argue that since memoranda indicating BP's intentions in developing the well could only be obtained from the company's internal records, the Marshalls could not have reasonably discovered a cause of action for fraud until June 2000, when those records were produced to them in the Vaquillas lawsuit. BP responds that the Marshalls could have discovered any cessation of good faith operations and the existence of a cause of action against BP from publicly available sources before limitations had run.

The record in this case indicates that BP made verbal representations and sent the Marshalls a letter asserting it conducted continuous operations on the J.O. Walker No. 1 well. The letter described a number of BP's activities on the well, including testing the pressure and monitoring water flow in efforts to obtain production. The letter also detailed recompletion efforts without stating they occurred at a shallower depth, the Upper Wilcox, after BP did not find the Lower Wilcox and lost hope of production from the Middle Wilcox, the depth it initially attempted to develop.

Also contained within the record are internal BP memoranda indicating that the company had little expectation that continuing operations would prove successful. The Marshalls argue that listing the operations in Young's letter without stating they had a low possibility of success was fraudulent. They point out that Young's letter disclosed that on December 4 the well "flowed frac water to pit for two hours," while failing to disclose that the well "blew down to zero in one minute" and began producing water[5] created a false impression that the well had a chance at being productive. Had BP disclosed that the well blew down to zero in such a short time, the Marshalls argue that they would have questioned BP's good faith in continuing operations on January 7, 1981. Moreover, the Marshalls' expert testified that BP failed to disclose that it originally targeted the Lower Wilcox in drilling the well, and began operations at the Middle and Upper Wilcox intervals only after no Lower Wilcox deposits were found. The expert testified that BP's efforts to recomplete the well at the Upper Wilcox depth were not in good faith because a reasonable and prudent operator would know at that point that the well was never going to produce in paying quantities. The Marshalls also argue that the letter misleadingly listed operations to recomplete the well without mentioning BP was targeting a different interval, the Upper Wilcox. Had BP disclosed that it was conducting operations at a new depth, the Marshalls contend that they would have been more inclined to question whether such efforts were conducted in good faith.

■ However, to obtain the benefit of tolling based on fraudulent representations, the Marshalls had to establish that their reliance on the information BP provided was reasonable, and reliance is not reasonable when information revealing the truth could have been discovered within the limitations period. *See Arabian Shield Dev. Co. v. Hunt,* 808 S.W.2d 577, 584–85 (Tex.App.-Dallas 1991, writ ref. n.r.e.). As we have noted, the information BP failed to disclose to the Marshalls was independently available from the Railroad Commission no later than October 1982, when BP filed the well log for J.O. Walker No. 1.

**5.** At trial, the Marshalls' expert explained that the disclosure was misleading because it created an impression that the only water coming from the well was the water pumped into the ground during recompletion, and concealed the fact that the well began producing its own water and was incapable of sustaining sufficient pressure to bring gas to the surface.

While the Marshalls are correct in pointing out that the well log did not list BP's operations in the Upper Wilcox, the plugging report filed with the Commission's Corpus Christi district office on October 6, 1981, well within the limitations period, did. These public documents, the well log and the plugging report, read together, would have led the Marshalls to discover that BP conducted operations at an interval incapable of production. Moreover, Stanley Marshall testified that he was a sophisticated lessor who subscribed to industry publications, worked as a driller when he was younger, and thus understood the oil and gas industry. Consequently, as a matter of law, the Marshalls would have been able to discover BP's fraud though the use of reasonable diligence. We therefore hold that the Marshalls' claims are barred by the statute of limitations, and reverse and render for BP.

### III. ADVERSE POSSESSION

In the dispute between Wagner and Vaquillas, Wagner challenges the reversal of the trial court's judgment that Wagner acquired title to the Vaquillas lease by adverse possession. In support of the court of appeals' judgment, Vaquillas argues that Wagner could not adversely possess the leasehold because its possession did not meet the requirements for adverse possession between cotenants. Vaquillas further argues that Wagner's possession had to take place after Vaquillas's cause of action accrued in June 2000, the date the jury found BP's fraud reasonably could have been discovered. We disagree with both propositions.

■ Under Texas law, adverse possession requires "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." TEX. CIV. PRAC. & REM.

CODE § 16.021(1). The statute requires visible appropriation; mistaken beliefs about ownership do not transfer title until someone acts on them. *Tran v. Macha,* 213 S.W.3d 913, 914 (Tex.2006); *Bywaters v. Gannon,* 686 S.W.2d 593, 595 (Tex.1985); *see also Natural Gas Pipeline Co. of Am. v. Pool,* 124 S.W.3d 188, 198 (Tex.2003) (holding that "a record titleholder's ignorance of what it owns does not affect the running of limitations").

■ "A mineral estate, even when severed from the surface estate, may be adversely possessed under the various statutes of limitations," so long as the statutory requirements are met. *See Pool,* 124 S.W.3d at 192–93. Here, Wagner argued it established adverse possession under the three-, five-, and ten-year statutes of limitations. The issue was submitted to the jury, and the jury determined that Wagner's possession was sufficient to meet all three. Vaquillas does not challenge the jury's finding that Wagner possessed the leasehold for the requisite time. The three-year statute of limitation states that the suit "to recover real property held by another in peaceable and adverse possession under title or color of title" must be brought "not later than three years after the day the cause of action accrues." TEX. CIV. PRAC. & REM. CODE § 16.024. The five-year statute requires the owner to bring suit within five years to recover property held by another in peaceable and adverse possession who cultivates, uses, or enjoys the property, pays taxes, and claims under a duly registered deed. *Id.* § 16.025(a). The ten-year statute requires suit "to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property." *Id.* § 16.026(a).

Vaquillas does not dispute that Wagner paid applicable taxes and claimed the lease

under a duly registered deed. Vaquillas's suit was filed in 1997, well over ten years after the good faith operations allegedly ceased in January 1981. During that time, Sanchez–O'Brien, its successors-in-interest, and then Wagner[6] claimed the lease, produced oil and gas, sold it, and paid Vaquillas a royalty. Because the statute provides that the possessor may tack the time it held the leasehold with its predecessors-in-interest, Wagner would meet the ten-year statute of limitations by tacking its period of possession with Sanchez–O'Brien's and Fina's, so long as its actions met all other requirements of adverse possession. *See id.* § 16.023. Accordingly, we need not consider the three- and five-year statutes of limitations.

▆▆▆▆ The statute also requires that the possession be inconsistent with and hostile to the claims of all others. *Id.* § 16.021(1). The "possession must be of such character as to indicate *unmistakably* an assertion of a claim of exclusive ownership in the occupant." *Rhodes v. Cahill,* 802 S.W.2d 643, 645 (Tex.1990) (quoting *Rick v. Grubbs,* 147 Tex. 267, 214 S.W.2d 925, 927 (1948); *McDonnold v. Weinacht,* 465 S.W.2d 136, 141 (Tex.1971)). In an adverse possession claim between cotenants, the proponent must prove ouster— unequivocal, unmistakable, and hostile acts the possessor took to disseize other cotenants. *See King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 756 (Tex.2003); *Todd v. Bruner,* 365 S.W.2d 155, 159–60 (Tex. 1963). Cotenants must surmount a more stringent requirement because acts of ownership "which, if done by a stranger, would per se be a disseizin" are not necessarily such when cotenants share an undivided interest. *Todd,* 365 S.W.2d at 160 (internal citation omitted).

## A. Adverse possession between cotenants

▆▆▆▆ The court of appeals held that Vaquillas's and Wagner's predecessor-in-interest became cotenants in April 1981, after the lease terminated due to cessation of good-faith operations. 288 S.W.3d at 460; *see Wagner & Brown, Ltd. v. Sheppard,* 282 S.W.3d 419, 421–22 (Tex.2008) (recognizing that a lessor became an unleased cotenant when the lease lapsed, and was entitled to a share of proceeds from minerals, less the lessor's share of the costs of production and marketing). Assuming that the lease had in fact terminated, Wagner then had to show it repudiated Vaquillas's cotenancy interest to assert title by adverse possession. *See King Ranch,* 118 S.W.3d at 756. As a cotenant, Wagner had the right to drill, explore, and produce from the land, owing other cotenants an accounting for their portion of the minerals. *See Byrom v. Pendley,* 717 S.W.2d 602, 605 (Tex.1986). In order to obtain title by adverse possession, Wagner had to show unmistakable and hostile acts that would put other cotenants on notice of its intent to oust them from the leasehold. *See Todd,* 365 S.W.2d at 159–160; *Poenisch v. Quarnstrom,* 361 S.W.2d 367, 369 (Tex.1962) (citation omitted).

▆▆▆▆ The ouster standard that applies to cotenants differs from the adverse possession requirement courts impose between strangers because cotenants have rights to ownership and use of the property a stranger would not have. *See Pool,* 124 S.W.3d at 198 (noting that the finding of adverse possession is premised on the

---

**6.** Sanchez–O'Brien obtained an assignment from BP and drilled a productive well in April 1981. It and its successor-in-interest continued operations until August 1994, when Wag- ner acquired the leasehold. The parties do not dispute that all lessees conducted continuous good faith operations since April 1981.

fact the parties were not cotenants). Vaquillas argues that Wagner could not show ouster because its actions in drilling, producing, and paying royalties were consistent with its rights as a cotenant and thus could not be unmistakably exclusive and hostile. We disagree that payment of royalties is consistent with the relationship between cotenants.

The test for establishing adverse possession, both between strangers and cotenants, is whether the acts unmistakably assert a claim of "exclusive ownership" by the occupant. *See Rhodes,* 802 S.W.2d at 645 (quoting *Satterwhite v. Rosser,* 61 Tex. 166 (1884)); *Rick,* 214 S.W.2d at 927. In Texas, unleased cotenants are generally entitled to "the value of the minerals taken less the necessary and reasonable cost of producing and marketing the same" as opposed to a fractional royalty from production paid to the lessor. *Cox v. Davison,* 397 S.W.2d 200, 201 (Tex.1965). In this case, it would mean that, absent a lessor/lessee relationship between Vaquillas and Wagner, Vaquillas would have been entitled to its share of the production for its 1/4 mineral interest in Slator Ranch minerals, minus reasonable costs. Vaquillas's expert testified regarding Wagner's checks, which showed a royalty interest of 4.23 percent and not the cotenant share of approximately 25 percent that Vaquillas would have been entitled to as a cotenant, a significant and noticeable difference. Wagner's payment of royalties—not a cotenant's share—to Vaquillas for the entire time it operated on the lease was thus an unmistakable and hostile assertion of exclusive ownership of the leasehold. *See Pool,* 124 S.W.3d at 198.

In *Pool,* we held that producing hydrocarbons and paying a 1/8 royalty rather than a share of production for more than ten years after leases terminated established adverse possession by the lessee.

*Id.* at 197–98. In reaching our decision, we expressly noted that the parties were not cotenants, and that production would not be sufficient evidence of disseizin in a cotenancy. *Id.* However, our statements in *Pool* were not meant to imply that adverse possession could never occur between cotenants, but rather to highlight that a stricter ouster standard applies. *Id.; see also Todd,* 365 S.W.2d at 160 (holding that "if the acts of the respondents and their predecessors in title are susceptible of explanation consistent with the existence of the common title then such acts cannot ... give constructive notice to the cotenants out of possession" (citation omitted)). A cotenant's use of the common property is presumed non-adverse unless the cotenant repudiates the title of its cotenant. *See Todd,* 365 S.W.2d at 156, 161.

Under *Pool,* drilling, production, and other routine operations by a cotenant would be consistent with a cotenancy and thus not unmistakably hostile. *Pool,* 124 S.W.3d at 197. However, the same cannot be said about Wagner's payment of a royalty rather than a significantly, noticeably larger cotenant's share to Vaquillas. *Id.* It is undisputed that royalty checks were unmistakably labeled as royalties and contained payments of a 4.23 percent royalty interest. The parties agree that Vaquillas accepted the checks, and even challenged their calculations over the course of Wagner's operations.

By paying a royalty, Wagner asserted a lessor-lessee relationship in which Wagner, not Vaquillas, owned the leasehold. *Compare Coastal Oil & Gas Corp. v. Garza Energy Trust,* 268 S.W.3d 1, 9 (Tex.2008) (holding that the mineral lessor has only a royalty interest in the minerals), *with Cox,* 397 S.W.2d at 201 (holding that an unleased mineral cotenant is entitled to "the value of the minerals taken less the neces-

sary and reasonable cost of producing and marketing the same"). In addition, Vaquillas does not dispute other actions putting it on notice that Wagner acted as a lessee and not a cotenant, including division orders certifying that Vaquillas owned a royalty interest and not a cotenant's share; correspondence from Vaquillas's counsel recognizing a royalty interest; deed records recognizing a royalty interest and not a cotenant's share; and Vaquillas's expert's annual review of production records for tax assessment purposes. Accordingly, we hold that Wagner's payment of a royalty and Vaquillas's acceptance of it establish as a matter of law that Vaquillas was on notice that Wagner claimed to own the leasehold—an unmistakably hostile and unequivocal assertion of title inconsistent with the existence of a cotenant relationship.

## B.  Knowledge of lease termination

The court of appeals held that the evidence of drilling, production, and even payment of royalties and taxes was legally insufficient to support the jury's verdict for Wagner because Vaquillas did not know the lease had terminated. 288 S.W.3d at 461. Again, we disagree. We have previously held that adverse possession is not dependent on the possessor's intent to assert title hostile to a known true owner, but rather on the "intent to claim the land." *Calfee v. Duke,* 544 S.W.2d 640, 642 (Tex.1976); *see Tran,* 213 S.W.3d at 915 (holding that hostile use "does not require an intention to dispossess the rightful owner, or even know that there is one").

We note here, as we did in *Pool,* that Wagner was not required to give actual or constructive notice it was no longer claiming an interest under the lease in order to acquire title to the leasehold. *Pool,* 124 S.W.3d at 195. It was not the leases that

Wagner's possession must have been adverse to, but rather Vaquillas's "title to all the minerals after the leases allegedly terminated." *Id.* Wagner, like the lessees in *Pool,* continued to claim rights under the lease, and *that claim* was adverse to Vaquillas's title once the lease terminated. *See id.*

Because Wagner's continued payment of royalties under the lease was an assertion of title, Wagner's claim to be Vaquillas's lessee for the statutorily mandated period ousted Vaquillas from the mineral estate. It is immaterial whether Wagner asserted title with the intent to dispossess Vaquillas. By accepting a clearly labeled and computed royalty, Vaquillas was on notice that Wagner claimed title to the leasehold—an unequivocal claim to ownership unmistakably inconsistent with and hostile to Vaquillas's claim of a cotenant relationship. Accordingly, Wagner acquired the same interest it adversely possessed—a leasehold estate as defined by the original lease. *See Pool,* 124 S.W.3d at 199.

## C.  Accrual of claims

Finally, Vaquillas argues that Wagner could not prove adverse possession because the statute requires possession to begin after the "cause of action" accrues. *See, e.g.,* TEX. CIV. PRAC. & REM. CODE § 16.026(a) ("A person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property."). Vaquillas argues that since the jury determined that it did not have sufficient knowledge to put it on notice that BP had fraudulently concealed the cessation of good faith efforts to develop the well until 2000, Wagner's adverse possession cause of action likewise did not accrue until June 2000. We do not agree.

The structure of the adverse possession statute indicates that the "cause of action" refers to the suit "to recover real property held by another in peaceable and adverse possession." *See id.* §§ 16.024–026(a). The statute thus requires the accrual of any claim Vaquillas may have had to assert its title to the leasehold against Wagner, rather than accrual of Vaquillas's fraud or lease termination causes of action. Accordingly, the cause of action accrued when Wagner's adverse possession began. *See Horton v. Crawford*, 10 Tex. 382, 390–91 (Tex.1853) (holding that a cause of action accrues "at the instant of possession taken under the circumstances specified in the statute"); *see also Crow v. Payne*, 242 S.W.2d 824, 825 (Tex.Civ.App.-Amarillo 1951, no writ). Vaquillas's argument that BP's actions in concealing a lapse in production somehow prevented the accrual of Vaquillas's claims against Wagner misconstrues the statute.

Moreover, Vaquillas's argument is contrary to the jury's unchallenged finding that Vaquillas's failure to file suit within the limitations periods was not excused by BP's misrepresentations or Vaquillas's ignorance of the real facts. Given that unchallenged finding, the court of appeals erred in reversing the trial court's judgment recognizing Wagner's title to the leasehold.

## IV. CONCLUSION

We reverse the court of appeals' judgment as to both BP and Wagner. We hold that the evidence conclusively established that BP's fraud could have been discovered by the Marshalls through the exercise of reasonable diligence. We further hold that the court of appeals erred in reversing the trial court's judgment awarding title to Vaquillas's leasehold interest to Wagner. Accordingly, we reverse and render for BP and Wagner.

Justice GREEN did not participate in the decision.