

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-14-00110-CV

Mary **MOCZYGEMBA**,
Appellant

v.

Thomas J. **MOCZYGEMBA** and Harry Lee Moczygemba,
Appellees

From the 218th Judicial District Court, Wilson County, Texas
Trial Court No. 12-10-0573-CVW
Honorable Donna S. Rayes, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:       Karen Angelini, Justice
               Marialyn Barnard, Justice
               Rebeca C. Martinez, Justice

Delivered and Filed:  February 18, 2015

AFFIRMED

Mary Moczygemba appeals the trial court's granting of summary judgment in favor of her sons Thomas J. Moczygemba and Harry Lee Moczygemba. According to Mary, the trial court erred in determining that the statute of limitations barred her claims for breach of fiduciary duty. We affirm.

### BACKGROUND

Appellant Mary Moczygemba ("Mary") is the mother of Appellees Thomas J. Moczygemba and Harry Lee Moczygemba ("Tommy and Harry"). In addition to Tommy and

Harry, Mary has seven other children. At the time Mary's husband passed away in 1985, she owned a total of 400 acres of property, including some mineral interests therein. She had 100 acres in Wilson County that was given to her husband by his parents in 1962 and was subsequently improved with a ranch house. She had an adjacent 58 acres that she and her husband purchased in the 1960s. She also had another 203 acres in Wilson County that she and her husband purchased in 1969. And, she had 51.7 acres in Karnes County that was given to her by her parents. While her husband was alive, they had executed several oil-and-gas leases on land they owned in Wilson and Karnes Counties. After her husband's death, she executed several more oil-and-gas leases.

While her husband was alive, they used their land to raise cattle. After her husband's death, Tommy and Harry helped Mary on the farms and helped her raise her cattle. Tommy did most of the work related to her farm and ranch business, and Harry helped Tommy do some of the work. Mary, in turn, allowed Harry and Tommy to run their own cattle on the land.

In 2000, when Mary was 74 years old, she sold about 200 acres to Tommy for $40,000 and 200 acres to Harry for $40,000. In her deposition, Mary testified that she decided to sell the acreage to her sons because her farm and ranch business was not making money and she was concerned about the depletion of her farm account due to expenses of her farm and cattle business. After she expressed her concerns to Tommy and Harry, they offered to buy the acreage from her. Mary testified, "I was running out of money to run the farm. And like they said, I wouldn't have to pay another bill. So I thought that would be a big relief for me." "We did it willingly together because they were – they were helping me. They were working with me. I trusted them." Mary testified that she was the one who came up with the price. She suggested a price lower than market value "because they were helping me, and they were my sons. I just thought I'll let them have it cheaper." Tommy, Mary, and Harry all agreed to use Tommy Adkisson's law office, which Mary had used in the past to prepare her will and to probate her husband's estate, because, as Mary testified,

"[t]hat's the only attorney we knew." Mary testified that she wanted Adkisson to prepare the deeds, but he was unable to help her. So, David Wise, an attorney in Adkisson's office, prepared the deeds transferring ownership from Mary to Harry and Tommy, respectively. The previous deeds were taken from Mary's files at her home and given to David Wise so that he would have the property description for the deeds he was preparing. Mary then went to his law office to sign four deeds transferring ownership to her sons. In a deed dated June 16, 2000, Mary transferred 51.7 acres in Karnes County to Tommy for "TEN AND NO/100 DOLLARS and other valuable consideration." In a second deed dated August 1, 2000, Mary transferred two tracts in Wilson County (one consisting of 79 acres and the other consisting of 124 acres) to Harry for "TEN AND NO/100 DOLLARS and other valuable consideration." In a third deed dated December 21, 2000, Mary transferred 58 acres in Wilson County to Tommy for "TEN AND NO/100 DOLLARS and other valuable consideration." Finally, in a fourth deed also dated December 21, 2000, Mary transferred 100 acres in Wilson County to Tommy for "TEN AND NO/100 DOLLARS and other valuable consideration."

Mary testified that minerals were "never discussed; it was never brought up." According to Mary, she never said she wanted to keep her mineral interests "because I didn't think about it." She testified that she thought that the minerals would remain with her. When asked why she thought she would retain ownership of the minerals if she was selling the land to her sons, Mary responded, "Well, I didn't even think of it." "They should have asked me." "It never crossed my mind." Likewise, Tommy testified that he did not think about whether the new deeds prepared by David Wise included his mother's mineral interests. According to Tommy, it never occurred to him either. The new deeds prepared by David Wise contained no provisions reserving any mineral interests. Thus, under Texas law, all of the surface estates and the mineral interests owned by Mary transferred to Tommy and Harry, respectively. *See Cockrell v. Tex. Gulf Sulphur Co.*, 157 Tex. 10,

299 S.W.2d 672, 675 (1956) ("[I]t is fundamental that a warranty deed will pass all of the estate owned by the grantor at the time of the conveyance unless there are reservations or exceptions which reduce the estate conveyed.").

David Wise testified in his deposition that he had no independent recollection of preparing the deeds or meeting with Mary, Tommy, and Harry. When it was pointed out that the previous deed relating to one of the properties granted Mary and her husband mineral rights after the expiration of twenty-five years relating to a lease, Wise testified "the only reason" a mineral reservation would not have been included in the new deed "would have been because Ms. [Mary] Moczygemba said so." "Like I said, if she would have said reserve this, reserve that, or subject to this or that, then it would have been written down."

Shortly after Mary transferred the deeds to her sons Tommy and Harry, her eldest son, Edwin, learned of Mary selling the land to his brothers Tommy and Harry. Edwin then told his other siblings. Mary testified that Edwin was so upset that she had sold the land to Tommy and Harry that he did not speak to her for twelve years. Mary claims in her pleadings that it was not until late 2009 or early 2010 that she discovered she had also conveyed the mineral interests to Tommy and Harry. In her deposition, she was adamant that Tommy and Harry should have told her that she was conveying her mineral interest with the surface estate:

A: They should have told me. "Mom, you want to keep half of your minerals, and we'll have the other half." Everything would have been fine. We would be –

Q: They should have told you that? Why should they have told you that when it was never discussed; they never knew your intentions; they didn't know what your mind was thinking? How would – why do you think that they should have told you something?

A: Well, because they should have figured it out that that's not fair that they're going to get all the minerals.

Q: Now, when they bought the land in 2000, there had never been any mineral production off the land, had there?

A: Not on that – not that area, but there was at the other place, what Harry bought.

Q: And you knew that?

A: I knew that.

Q: In 2000, nobody knew there was going to be an Eagle Ford Shale, did they?

A: Probably not.

Q: Nobody knew if those minerals were ever going to have any value, did they?

A: Yeah. But after they started leasing, they should have come, "Well, Mom, look. We're going to be leasing. Let's just share it."

Q: All right.

A: Wouldn't that have been nice?

Mary's daughter Rosemary Ellis testified that there was a "family meeting" in May 2012, at which Tommy and Harry were not present, and that at that meeting, Mary "said that she did not sell the land intentionally to them and the mineral rights at that time." "She did not know about those mineral rights and she did not do that on purpose." "She said that she was running out of money, and they approached her to buy it." "They agreed on the price, they picked up the deeds, went to the attorney's office, and had them done very quickly."

On October 19, 2012, Mary sued Tommy and Harry for breach of fiduciary duty, alleging that Tommy and Harry owed her an "informal" fiduciary duty arising from "their moral, domestic and personal relationship of trust and confidence." Mary alleged they breached their fiduciary duties to her, "specifically their duty of loyalty and utmost good faith, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, and duty of full disclosure" "by inducing Mary to sign the general warranty deeds in 2000, knowing that Mary did not understand the legal impact of their deeds with regard to her mineral interest ownership." Mary alleged Tommy and Harry "further breached their fiduciary duty by not explaining in complete detail the ramifications

of signing these deeds, in particular that Mary would be giving up her mineral interests." Tommy and Harry filed a motion for summary judgment arguing that they had no fiduciary duty to their mother and a motion for summary judgment arguing that Mary's claims were barred by the statute of limitations. The trial court denied the motion for summary judgment relating to fiduciary duties, but granted the motion for summary judgment relating to limitations. Mary appeals, arguing the trial court erred in granting summary judgment based on limitations.

## STATUTE OF LIMITATIONS

Mary brought claims for breach of fiduciary duty against Tommy and Harry. A person bringing a claim for breach of fiduciary duty must file suit not later than four years after the day the cause of action accrues. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(5) (West 2002). Generally, when a cause of action accrues is a question of law. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). "[A] cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Id.* "In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Id.* However, two exceptions may defer accrual of a claim: the discovery rule and the doctrine of fraudulent concealment. Here, Mary pled the discovery rule.[1] Tommy and Harry argue the discovery rule does not apply.

### A. Standard of Review

We review the trial court's grant of summary judgment de novo. *Provident*, 128 S.W.3d at 215. When reviewing a summary judgment, we take as true all evidence favorable to the

---

[1] It is undisputed that in the absence of the discovery rule, the statute of limitations bars Mary's breach of fiduciary duty claims against Tommy and Harry.

respondent, and we indulge every reasonable inference and resolve any doubts in the respondent's favor. *Id.*

"A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). "Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury." *Id.* Thus, if the plaintiff pleads the discovery rule as an exception to limitations, the movant must negate that exception as well by proving as a matter of law that either (1) the discovery rule does not apply or (2) there is no genuine issue of material fact about when the plaintiff discovered or, in the exercise of reasonable diligence, should have discovered the nature of the alleged injury. *Howard v. Fiesta Texas Park Show, Inc.*, 980 S.W.2d 716, 719 (Tex. App.—San Antonio 1998, pet. denied). If the movant establishes that the statute of limitations bars the action, the respondent must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations. *KPMG*, 988 S.W.2d at 749.

> B.      *Does the discovery rule apply in this case?*

The discovery rule is "a very limited exception to statutes of limitations." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929 (Tex. 2011) (citation omitted). It applies to instances in which the nature of the plaintiff's injury is "inherently undiscoverable and the evidence of injury is objectively verifiable." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 65-66 (Tex. 2011) (citation omitted). Requiring both that a plaintiff's injury be inherently undiscoverable and evidence of that injury be objectively verifiable "balance the conflicting policies in statutes of limitations: the benefits of precluding stale or spurious claims versus the risks of precluding meritorious claims

that happen to fall outside an arbitrarily set period." *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996). The supreme court has explained that the "concern that meritorious claims will be barred is . . . taken into account in fashioning these two elements." *Id.* at 15. "The two elements strike the proper balance between the beneficial purposes of statutes of limitations and the real concern that a person's rights may be cut off." *Id.* The "preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute." *Id.* (citation omitted). "The primary purpose of limitations, to prevent litigation of stale or fraudulent claims, must be kept in mind." *Id.* "Allowing late-filed claims that are inherently undiscoverable while requiring objectively verifiable injury reduces the likelihood of injustice in cutting off valid claims while affording some protection against stale and fraudulent claims." *Id.*; *see Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (explaining that the supreme court has "restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitations statutes").

In this case, Tommy and Harry argue that the discovery rule does not apply because (1) Mary's injury, the allegedly wrongful transfer of the mineral interests, was not inherently undiscoverable, and was in fact easily discoverable if she had simply read the deeds; and (2) the evidence of her injury is not objectively verifiable. We agree with Tommy and Harry that they have met their summary judgment burden of showing that there is no objectively verifiable evidence of Mary's injury.

The supreme court has explained that requiring evidence of the nature of an injury to be objectively verifiable prevents fraudulent prosecutions. *See S.V.*, 933 S.W.2d at 6. For example, in *Gaddis v. Smith*, 417 S.W.2d 577, 581 (Tex. 1967), a plaintiff filed suit after the statute of limitations had run claiming that her doctors were negligent in leaving a sponge insider her body after surgery. "The presence of the sponge in her body–the injury–and the explanation for how it got there–the wrongful act– were beyond dispute." *S.V.*, 933 S.W.2d at 7 (discussing *Gaddis*).

"The facts upon which liability was asserted were demonstrated by direct, physical evidence." *Id.*

In contrast, in *Robinson v. Weaver*, 550 S.W.2d 18, 21 (Tex. 1977), the supreme court held there was no objectively verifiable evidence of the plaintiff's injury. In that case, a patient brought a claim against his doctors for misdiagnosis of his back condition. The supreme court explained,

> Plaintiff, to prove his cause of action, faces the burden of proving both a mistake in professional judgment and that such mistake was negligent. Expert testimony would be required. Physical evidence generally is not available when the primary issue relevant to liability concerns correctness of past judgment. Unlike *Gaddis v. Smith*, there exists in the present case no physical evidence which in-and-of-itself establishes the negligence of some person. What physical evidence was to the cause of action alleged in *Gaddis v. Smith*, expert testimony is to the cause of action in the present case. Even the fact of injury is a matter of expert testimony.

*Robinson*, 550 S.W.2d at 21. The supreme court concluded that such expert testimony could not meet the objective verification of wrong and injury necessary for application of the discovery rule. *Id.*; *see S.V.*, 933 S.W.2d at 7 (discussing *Robinson*).

Similarly, in *S.V.*, 933 S.W.2d at 3, the supreme court was faced with the issue of whether there was objectively verifiable evidence of the plaintiff's injury in a case where the plaintiff alleged she had been sexually abused by her father until the age of seventeen but had repressed all memory of the abuse until after she turned twenty. The supreme court noted that the only physical evidence to support the plaintiff's allegations consisted of her symptoms and, to a lesser extent, her behavioral traits, as described by her and the experts who testified on her behalf. *Id.* at 15. The supreme court explained that this evidence, however, was inconclusive because the experts testified her symptoms could have been caused by things other than sexual abuse by her father. *Id.* The court concluded there was "no physical or other evidence in this case to satisfy the element of objective verifiability for application of the discovery rule." *Id.* The court pointed to examples of different types of evidence that it would consider objectively verifiable:

> The kinds of evidence that would suffice would be a confession by the abuser, *e.g., Meiers-Post v. Schafer*, 170 Mich. App. 174, 427 N.W.2d 606, 610 (1988); a criminal conviction, *e.g. Petersen v. Bruen*, 106 Nev. 271, 792 P.2d 18, 24-25 (1990); contemporaneous records or written statements of the abuser such as diaries or letters; medical records of the person abused showing contemporaneous physical injury resulting from the abuse; photographs or recordings of the abuse; an objective eyewitness's account; and the like. Such evidence would provide sufficient objective verification of abuse, even if it occurred years before suit was brought, to warrant application of the discovery rule.

*S.V.*, 933 S.W.2d at 15.

While Mary cites case law for the proposition that "[i]t is well-settled law that the discovery rule applies to almost all actions involving fiduciaries," the supreme court has explained that bringing a breach of fiduciary duty claim does not negate the necessity of the plaintiff's injury being shown through objectively verifiable evidence. In *S.V.*, the supreme court explained that while it has "adhered to the requirement of objective verification fairly consistently in [its] discovery rule cases," it has "not always emphasized the requirement *because the alleged injury was indisputable*." *S.V.*, 933 S.W.2d at 7 (emphasis added). As an example, the *S.V.* court cited *Willis v. Maverick*, 760 S.W.2d 642 (Tex. 1988), noting that the "attorney's error [was] apparent in [the] divorce decree." *S.V.*, 933 S.W.2d at 7. The *S.V.* court also cited *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963), which involved a corporation suing three of its officers and directors for breach of fiduciary duty because the officers and directors sold "their personal stock in competition with the sale of corporation stock." *Holloway*, 368 S.W.2d at 579; *see S.V.*, 933 S.W.2d at 7. The *S.V.* court explained that in *Holloway*, the objectively verifiable evidence of the plaintiff's injury consisted of "stock transfer records and board meeting minutes prov[ing] officers' and directors' misdealing." *S.V.*, 933 S.W.2d at 7.

The *S.V.* court also cited *Slay v. Burnett Trust*, 143 Tex. 621, 187 S.W.2d 377, 385-87 (1945), another fiduciary duty case involving plaintiffs suing trustees to recover alleged secret profits received by former trustees and other defendants, and to recover damages for alleged losses

on improper loans of trust funds. The *S.V.* court explained that the objectively verifiable evidence in *Slay* consisted of a "paper trail detail[ing] self-dealing." *S.V.*, 933 S.W.2d at 7. Thus, even in the context of a claim for breach of fiduciary duty, for the discovery rule to apply, there must be objectively verifiable evidence of the alleged injury.

The evidence in this case consists of deposition testimony, which is not objectively verifiable evidence, and copies of the actual deeds showing a transfer of the mineral estate from Mary to Tommy and Harry, respectively. While the deeds are evidence that Mary's mineral interests passed to her sons, they are not evidence that the mineral interests were *wrongfully* transferred to her sons.

Mary urges that this case is like *Gaddis* and the mere fact that her mineral interests were transferred shows she was injured; that is, she argues that no one would have chosen to transfer the mineral estate below market value. However, this case involved a transfer of land between a mother and her sons. Mary herself testified that she wanted to transfer her property to her sons at a price lower than market value because they were her sons and they were helping her. Put in that context, we cannot say that the same conclusion as that in *Gaddis* would apply to these facts. Thus, we cannot conclude that the mere transfer of mineral interests necessarily equates to Mary having suffered from a wrongful transfer of her property.

Further, Mary agrees that at the time of the transfer of the property, there were no discussions about the mineral interests because she never thought about the mineral interests. In his deposition, Tommy agreed that there were no discussions relating to the mineral interests. Tommy testified the mineral interests never occurred to him either. Thus, Tommy and Harry met their summary judgment burden of showing there is no objectively verifiable evidence of Mary's

injury, and the trial court did not err in determining that the discovery rule did not apply to this case.[2]

**CONCLUSION**

Because the discovery rule does not apply to this case, we affirm the trial court's judgment.

Karen Angelini, Justice

---

[2] Because we conclude that there is no objectively verifiable evidence of Mary's injury, we need not reach Mary's other issues of whether the nature of her injury was inherently undiscoverable and whether Mary knew or should have known of her claims more than four years before she filed suit.