ACCEPTED
14-15-00061-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
12/9/2015 11:38:11 PM
CHRISTOPHER PRINE
CLERK

**NO. 14-15-00061-CV**

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
12/9/2015 11:38:11 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE COURT OF APPEALS
## FOURTEENTH JUDICIAL DISTRICT
## HOUSTON, TEXAS

**B. MAHLER INTERESTS, L.P.,** *APPELLANT*

## V.

**DMAC CONSTRUCTION, INC.,** *APPELLEE*

On Appeal from Case Number 2012-64035
in the 152nd District Court, Harris County, Texas

### APPELLEE'S BRIEF

**REYNOLDS FRIZZELL LLP**
Brandon T. Allen
State Bar No: 24009353
James A. Schuelke
State Bar No: 24075037
Drew D. Pennebaker
State Bar No: 24083645
1100 Louisiana Street, Suite 3500
Houston, Texas 77002
Telephone: (713) 485-7200
Facsimile: (713) 485-7250
ballen@reynoldsfrizzell.com
jschuelke@reynoldsfrizzell.com

**ATTORNEYS FOR APPELLEE**
**DMAC CONSTRUCTION, INC.**

# TABLE OF CONTENTS[1]

**Page(s)**

TABLE OF CONTENTS....................................................................................i-iii

TABLE OF AUTHORITIES ........................................................................ iv-v

ISSUE PRESENTED......................................................................................1

STATEMENT OF FACTS .............................................................................2

SUMMARY OF THE ARGUMENT ..........................................................6

ARGUMENT ................................................................................................12

A. The Parties Agree that Mahler's Claims Are Subject to Four-year Statutes of Limitations, and that Barring Application of the Discovery Rule or Fraudulent Concealment, They Are Time-barred .........................................12

B. The Trial Court Properly Granted Summary Judgment Rejecting Mahler's Discovery Rule Counter-defense...................................................................13

    1. The Discovery Rule Does Not Apply to Mahler's UCC Claims ........13

    2. The Parties' Contract Eliminates the Discovery Rule ........................14

    3. The Discovery Rule Does Not Apply to Mahler's Claims Because Mahler's Alleged Injuries Are Not Inherently Undiscoverable..........17

        a. The Discovery Rule Does Not Defer Accrual of Mahler's Claims Concerning the Doors and Flooring, because a Manufacturer's Basic Product Information Is Not Inherently Undiscoverable; Indeed, It Was *Actually Known* to Mahler ....18

---

[1] Appellant's Brief begins by addressing DMAC's no-evidence motion for summary judgment. Appellee's no-evidence points pertain only to Mahler's fraudulent concealment counter-defense, so they are addressed in Section C.6 of this Brief with the remainder of the argument concerning fraudulent concealment. Appellee's traditional summary judgment addressed all Appellant's claims and counter-defenses and is treated first herein. Similarly, Mahler's second issue pertains to the burden of pleading and proving fraudulent concealment and is addressed in Section C.1 of this Brief.

b. The Discovery Rule Does Not Apply to Mahler's Claims Concerning the Porch Roofs .....................................................23

    i. The Materials and Finish Work for the Porch Roofs Were Both Discover*able* and Discover*ed* More than Four Years Before Mahler Filed Suit ..............................23

    ii. The Alleged Deficiencies in the Structural Framing for the Porch Roofs Were Both Discover*able* and Discover*ed* More than Four Years Before Mahler Filed Suit.......................................................................25

c. Conclusion on the Discovery Rule—Inapplicable ...................33

C. The Trial Court Properly Granted Summary Judgment over Mahler's Fraudulent Concealment Counter-Defense ...................................................34

1. Mahler Did Not Even Plead Fraudulent Concealment with Respect to its Claims Concerning the Porch Roof Construction, Much Less Introduce Evidence Sufficient to Carry Its Burden.............................35

2. Even if Mahler Had Properly Pled Fraudulent Concealment Concerning the Porch Roofs, DMAC's Motion for Summary Judgment Refuted an Element of that Counter-Defense as a Matter of Law...........................................................................................39

3. The Summary Judgment Evidence Conclusively Demonstrates that DMAC Never Misrepresented or Concealed Any Information about the Floors or the Doors.............................................................41

4. Even if DMAC Had Made a Misrepresentation About the Floors or the Doors (It Did Not), Fraudulent Concealment Would Be Unavailable to Toll Limitations Because the Relevant Facts Could Have Been Discovered Through Reasonable Diligence.....................44

5. Mahler Did Not Rely on Any DMAC Representations Concerning

the Doors or Floors, and Any Reliance Would Have Been
Unreasonable .....................................................................................46

6.    The Trial Court Properly Granted DMAC's No-Evidence Motion
on Fraudulent Concealment Because Mahler Failed to Meet its
Burden to Produce Evidence Supporting Each Element of its
Counter-Defense..................................................................................48

CONCLUSION .............................................................................................50

CERTIFICATION OF COMPLIANCE ..................................................................51

CERTIFICATE OF SERVICE .........................................................................51

# TABLE OF AUTHORITIES

**<u>CASES</u>**            **<u>PAGE(S)</u>**

*Am. Alloy Steel, Inc. v. Armco, Inc.*,
    777 S.W.2d 173 (Tex. App.—Houston [14th Dist.]
    1989, no writ)……………………………………………………………13

*Barker v. Eckman*,
    213 S.W.3d 306 (Tex. 2006)………………………………………………17-18

*Bayou Bend Towers Council of Co-Owners v. Manhattan Const.*
    *Co.*, 866 S.W.2d 740 (Tex. App.—Houston [14th Dist.]
    1993, writ denied) ………………………………….30, 34, 39-40, 43, 45, 48

*Booker v. Real Homes, Inc.*,
    103 S.W.3d 487 (Tex. App.—San Antonio 2003)
    *<u>as clarified on denial of</u> <u>reh'g</u>* (Feb. 26, 2003) ……………..……...…43-44

*BP America Production Co. v. Marshall*,
    342 S.W.3d 59 (Tex. 2011) ……………………………...9-10, 28, 40, 44-47

*Brisbane Lodging, L.P. v. Webcor Builders, Inc.*,
    216 Cal. App. 4th 1249 (Cal. Ct. App. 2013) ……………………………..15

*Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*,
    416 S.W.3d 527 (Tex. App.—Houston [14th Dist.]
    2013, no pet) …………………………………………………………….18

*Computer Associates International, Inc. v. Altai, Inc.*,
    918 S.W.2d 453 (Tex. 1996) …………………………………………...19

*EZ Pawn Corp. v. Mancias*,
    934 S.W.2d 87 (Tex. 1996) …………………………….………….....16

*Goswami v. Metro. Sav. & Loan Ass'n*,
    751 S.W.2d 487 (Tex. 1988) …………………………….………………38

*HECI Expl. Co. v. Neel*,
   982 S.W.2d 881 (Tex. 1998) …………………….……….……19, 22, 31, 43

*In re Bank One, N.A.*,
   216 S.W.3d 825 (Tex. 2007) …………………………….…….……..16

*In re Ledet*,
   2004 WL 2945699 (Tex. App.—San Antonio
   Dec. 22, 2004, no pet.) ……………………….…………….…………......16

*In re McKinney*,
   167 S.W.3d 833 (Tex. 2005) ……………………………………...…16

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*,
   962 S.W.2d 507 (Tex. 1998) ………………………………………..35, 49

*Key v. Viera*,
   01-07-00587-CV, 2009 WL 350602 (Tex. App.—Houston
   [1st Dist.] Feb. 12, 2009, no pet.) ……………………………………......12

*KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*,
   988 S.W.2d 746 (Tex. 1999) ……………………………………….…..34

*Medina v. Tate*,
   01-12-00496-CV, 2013 WL 3421973 (Tex. App.—Houston
   [1st Dist.] July 9,   2013, no pet.) ………………………………....…..44

*PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*,
   146 S.W.3d 79 (Tex. 2004) ………..…….………………13, 17-18, 30, 43

*Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*,
   467 S.W.3d 494 (Tex. 2015), *reh'g denied* (Sept. 11, 2015) …………...…16

*Safeway Stores, Inc. v. Certainteed Corp.*,
   710 S.W.2d 544 (Tex. 1986) ………………………………...….…………12

*Shell Oil Co. v. Ross*,
   356 S.W.3d 924 (Tex. 2011) ...……………………………6, 34-35,48-49

v

*Vera v. N. Star Dodge Sales, Inc.*,
    989 S.W.2d 13 (Tex. App.—San Antonio 1998, no pet.) …...…...…….16-17

*Via Net v. TIG Insurance Co.*,
    211 S.W.3d 310 (Tex. 2006) ………...…………12, 17-18, 21-22, 31-32, 43

*Wagner & Brown, Ltd. v. Horwood*,
    58 S.W.3d 732 (Tex. 2001) ………………………...……………18-20, 46

*Williams v. Khalaf*,
    802 S.W.2d 651 (Tex. 1990) …………………………………...………12

*Wilson v. Magaro*,
    01-12-00952-CV, 2013 WL 3243389 (Tex.
    App.—Houston [1st Dist.] June 25, 2013, no pet.) ………………….25

*Wortham v. Dow Chem. Co.*,
    179 S.W.3d 189 (Tex. App.—Houston [14th Dist.]
    2005, no pet.) …………………………………………………………36

## RULES AND STATUTES

Tex. Bus. & Com. Code §2.725(a) …………………………………...………..12

Tex. Bus. & Com. Code §2.725(b) …………………………………...…….12-13

C.P.R.C. §16.004 …………………...………………………………………..12

## ISSUE PRESENTED

1. Did the trial court correctly grant summary judgment in favor of Defendant-Appellee DMAC Construction, Inc. because Plaintiff-Appellant's claims are barred by the applicable statutes of limitations?

1

**STATEMENT OF FACTS**

Appellant B. Mahler Interests, L.P. ("Mahler"), hired Appellee DMAC Construction, Inc. ("DMAC") in 2005 as the general contractor for the construction of a multi-building event center and reception hall called Briscoe Manor (the "Project"). (C.R.[2] 151, 216). This lawsuit involves three components of the Project that Mahler now claims were installed in breach of the parties' contract: (1) certain wooden doors installed at exterior locations; (2) the flooring installed in certain rooms; and (3) the porch roofs built on either side of the main reception building. (C.R. 6-11, 215-16).

DMAC performed its work on these items in a good and workmanlike manner, consistent with its contractual obligations. This lawsuit is an attempt by the owner of a highly successful, award-winning wedding reception venue to force the original builder of that venue to pay for the cost of building upgrades and renovations years after the work was complete. Mahler did not file suit until the Project had been in use as a commercial reception venue for nearly six years, when Mahler was engaged in an expansion and extensive renovations on the Project. (C.R. 151, 214, 219). For the purposes of this appeal, the only relevant facts are those reflecting when Mahler knew or should have known of the facts giving rise to its claims. A review of the record evidence reveals that even if Mahler's claims

---

[2] Citations to the Clerk's Record are designated "C.R." followed by the page number. Citations to the Supplemental Clerk's Record are designated "S.C.R.#" followed by the page number. Citations to the Reporter's Record are designated "R.R." followed by the page number.

against DMAC were substantively valid (and they are not), they are plainly barred by the relevant statutes of limitations—just as Judge Schaffer found below.

Mahler and DMAC executed the construction contract at issue on November 29, 2005, and DMAC broke ground on the Project two months later, in January 2006. (C.R. 151, 154). Mahler was actively involved in the construction process. For example, Jorden Mahler[3]—part owner (along with other members of his family) and sole day-to-day manager of Appellant's business—selected the wooden doors at issue and was involved in the selection of the flooring product, which Mr. Mahler knew was made of a cost-effective composite material. (S.C.R.2 104, C.R. 221).

Construction, including installation of the doors, flooring, and porch roofs at issue, was substantially complete by October 25, 2006. (C.R. 161, 215, 225-26). The Project was opened and in regular use as an event venue before the end of 2006. (C.R. 151, 214). DMAC performed punch-list items and change-order work during the end of 2006 and for much of 2007. (C.R. 151).

In August 2007—over five years before filing this lawsuit—Mahler hired both a licensed professional inspector and a licensed professional engineer to inspect the property after it had been in use as a commercial event venue for almost

---

[3] Jorden Mahler is the only officer or employee of Appellant to offer any summary judgment evidence, either by deposition or affidavit (C.R. 207-60, S.C.R.2 29). He and his father, Bill Mahler, have made all material decisions for Mahler since its inception. (C.R. 212).

3

a year. (C.R. 163-90, 217, 236). These inspectors produced a detailed report of the condition of the Project, including evaluations of the structure, foundation, roof, load-bearing walls, ceilings, floors, plumbing system, electrical power system, heating and cooling systems, and appliances (the "2007 Report"). (C.R. 163).

The licensed professional engineer that Mahler hired, Edward Robinson, provided a standard inspection for patent defects, meaning that the report relied on visual observation of the property and that no special or destructive testing was performed. (C.R. 173-74). In this routine inspection report, Mr. Robinson specifically noted two of the three issues that would become the subject of this lawsuit more than five years later: according to Mr. Robinson, (1) the porch roof visibly sagged, indicating a "structure of insufficient stiffness to prevent the sag," and (2) the "owner had already expressed a concern that the wood exit doors from the buildings were not intended for exterior use." (C.R. 175, 179, 186).

On the basis of the 2007 Report and its own inspections and use of the Project, Mahler requested that DMAC perform certain limited corrective work on the Project, which DMAC did. (C.R. 151, 217). In 2007 and early 2008, Mr. Mahler had concerns about the structural framing of the porch roofs (C.R. 245), and he knew that DMAC never addressed these concerns (C.R. 241-42), but he chose not to perform any further inspection to follow up on the structural anomalies noted in the 2007 Report, (251-52)—the same alleged anomalies about

4

which Mahler now complains, (C.R. 244). Similarly, in 2007, Mahler knew that (as Mahler now complains) the wood exit doors were not warranted for exterior applications. (C.R. 227, 196-202). This fact was discussed openly between the parties on multiple occasions in 2007. (C.R. 204-05, 232-33).

All work on the project was fully and finally complete, and all payments were made and received by the end of January 2008. (C.R. 152). In April 2012, more than four years later, Mahler hired a professional engineer, Stephen Schilder, to inspect the Project and investigate potential deficiencies, including the issues raised in Mr. Robinson's 2007 Report concerning the porch roof framing and the concern about the wood exit doors. (S.C.R.2 13). By the time of Mr. Schilder's investigation, the award-winning Project had already been in use as an event center for approximately five and a half years. (C.R. 214).

Mahler filed this suit on October 26, 2012, more than six years after substantial completion and well more than four years after the last work on the Project was complete, asserting causes of action for breach of warranty and breach of contract. (C.R. 6-12).

DMAC filed its Amended Traditional and No-Evidence Motion for Summary Judgment (the "Motion") on July 18, 2014, and the Motion was set for hearing on August 8, 2014. On the afternoon of August 7, 2014, one day before the summary judgment hearing, Mahler, without prior leave of Court, filed an

amended petition. (C.R. 296). DMAC immediately filed an objection and requested that the amendment be stricken. (C.R. 307). At the summary judgment hearing, the trial court refused to consider Mahler's amendment, and stated that he would rule on the Motion based only on Mahler's Original Petition, which is therefore the live pleading on this appeal. (R.R. 31).

## SUMMARY OF THE ARGUMENT

The trial court, Judge Robert Schaffer, correctly granted DMAC's Motion because all of Mahler's claims are barred by the applicable four-year statutes of limitations. Mahler concedes that its claims are time-barred unless they were fraudulently concealed or the discovery rule applies. For the reasons set forth below, the summary judgment evidence conclusively demonstrates that neither the discovery rule nor fraudulent concealment can save Mahler's stale and meritless claims.

The discovery rule has no application to Mahler's claims. First, the parties' contract, written on a standard industry form, expressly precludes it. (C.R. 61). Even if it did not, the discovery rule applies only to "inherently undiscoverable" injuries that "by [their] nature [are] unlikely to be discovered within the prescribed limitations period despite due diligence." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 930 (Tex. 2011) (internal quotations omitted). The injuries of which Mahler complains are all readily discoverable, and indeed, the alleged factual bases for

6

each of Mahler's claims were not only discover*able* more than four years before Mahler filed this lawsuit; most were actually discover*ed* before that time.

Mahler's claims, all of which pertain to only three limited components or aspects of the work provided by DMAC, (C.R. 215-16), are as follows:

1. Mahler contends the **wooden doors** installed on the perimeter of the Project's ballroom were "interior grade" rather "exterior grade" and therefore unsuitable for their applied use (C.R. 8-11);

   - However, Mahler does not dispute that in 2007, more than five years before filing suit, Mr. Mahler requested and received the door manufacturer's official product specification sheets and warranty information, and an explanation from the door vendor that the doors were not warranted for exterior use. (C.R. 124-30, 226-26, 230).

   - Mahler also cannot dispute that the suitability of the doors was discussed openly between the parties in late 2007, nearly five years before suit was filed, when Mr. Mahler was in possession of all relevant information about their specifications, grade, and warranty. (C.R. 204-05).

2. Mahler contends the **flooring** installed in certain portions of the Project was "residential grade" rather than "commercial grade" and therefore unsuitable for its application in the Project (C.R. 8-11);

   - However, Mahler does not dispute that DMAC left a box of unused flooring material on the Project site, in Mahler's possession, following construction. (C.R. 222). Mahler was able to obtain relevant product specifications and warranty information simply by locating the manufacturer's contact information on the box of material and "pick[ing] up the phone." (C.R. 222-23).

3. Mahler contends the **porch roofs** or "porta cache" [sic] suffered from defects or deficiencies in their construction (C.R. 7-9).

   - However, Mahler does not dispute that it received the 2007 Report contemporaneously and understood that it raised a structural concern about the porch roofs. (C.R. 240-41).

   - Mahler also cannot dispute that on January 1, 2008, Mahler had concerns about the structural framing of the porch roofs, and expressed them to

7

DMAC. (C.R. 192-94, 245-46). Mahler knew that DMAC did not make any structural changes or repairs to the porch roofs, (C.R. 241-42), but waited more than four years to perform any independent follow-up investigation or file suit, (C.R. 252).

Based on the undisputed evidence, by the end of 2007 at the latest, Mahler either had "discover[ed], or through the exercise of reasonable care and diligence should have discovered, the nature of [its] injury." *Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.*, 866 S.W.2d 740, 742 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Accordingly, even if the discovery rule were not contractually eliminated, Mahler's claims accrued by the end of 2007 and the statute of limitations expired well before Mahler filed suit in October 2012.

Fraudulent concealment is equally inapplicable to Mahler's untimely claims. First, Mahler did not plead fraudulent concealment concerning the alleged defects in the porch roofs. Mahler's Original Petition pled fraudulent concealment only as to the claims relating to the doors and the floors, never alleging that DMAC made any misrepresentation or concealment concerning the porches. (C.R. 6-12). Mahler made an untimely attempt to amend its pleadings one day before the summary judgment hearing without leave of court, but the trial court properly rejected the amendment as untimely on the record at the hearing, expressly dispelling any presumption that the amendment was considered for purposes of determining the Motion.

8

With respect to the doors and the floors, Jorden Mahler—Mahler's owner and manager—unequivocally testified that DMAC never made any misrepresentations:

Q. And did anybody ever tell you -- **anybody with DMAC ever tell you these doors are commercial grade?**

A. **No**.

Q. They never told you that, right?

A. No.

Q. All right.  And did they -- **did anybody with DMAC ever tell you these doors are warranted for use in an exterior application?**

A. **No**.

Q. Nobody ever told you that, right?

A. No.

(C.R. 254-56 (emphasis added)). These admissions are fatal to Mahler's fraudulent concealment counter-defense.

Moreover, even assuming DMAC had made some false statement concerning the floors or the doors (which Mr. Mahler himself denies), the doctrine of fraudulent concealment requires a plaintiff to demonstrate *reasonable reliance* on a misrepresentation. Under Texas law, "reliance is not reasonable when information revealing the truth *could have been discovered* within the limitations period." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 68 (Tex. 2011). The summary judgment evidence demonstrates that Mahler had access to several

sources of information revealing the nature of any injury of which Mahler now complains. Mahler therefore plainly failed to exercise the level of diligence that is required of a plaintiff seeking to invoke fraudulent concealment:

> Because the [plaintiffs] were **obliged to perform additional investigation to protect their interests**, if [plaintiffs] **could have discovered** [defendant's] wrongdoing . . . through **means other than [defendant's] representations** before limitations expired, **they did not exercise reasonable diligence in relying on [defendant's] representations and limitations barred their claim**.

*BP Am. Prod.*, 342 S.W.3d at 67-68 (emphasis added).

The following table provides a timeline with record citations illustrating that Mahler's claims were filed well after the four-year statutes of limitations had expired:

10

| Timeline of Events | |
|---|---|
| **Date** | **Event** |
| Nov. 29, 2005 | •Contract formation. (C.R. 151, 154) |
| Jan. 2006 - Oct. 2006 | •Primary construction phase. (C.R. 161)<br>•Doors, floors, & porches built. (C.R. 215, 225-26; S.C.R.2 29) |
| Oct. 25, 2006 | •Substantial completion. (C.R. 161)<br><br>•Accrual of all claims arising from work performed before substantial completion. (C.R. 61) |
| 2006-2011 | •DMAC leaves box of excess flooring material bearing manufacturer information on Mahler's property. (C.R. 222-23) |
| Apr. 9, 2007 | •Mahler obtains specs and warranty info for doors (C.R. 124-30)<br>•Mahler has actual knowledge doors are not warranted for external use. (C.R. 232-33) |
| Aug. 16, 2007 | •Robinson issues 2007 Report noting structural issue with porch roof & concern that doors are interior grade. (C.R. 163, 175, 186)<br><br>•Actual notice of problem with porch roof. (C.R. 240-41). |
| Jan. 1, 2008 | • Mahler emails DMAC expressing concern about porch framing & attaching photos of porches under construction (C.R. 192-94, 245-46) |
| Jan. 31, 2008 | •All work on project complete & final payment made. (C.R. 152) |
| Apr. 2012 | •Mahler hires engineer/litigation consultant to investigate Project. (S.C.R.2 13) |
| **Oct. 26, 2012** | •Mahler files suit. (C.R. 6). |

11

**ARGUMENT**

**A. The Parties Agree that Mahler's Claims Are Subject to Four-year Statutes of Limitations, and that Barring Application of the Discovery Rule or Fraudulent Concealment, They Are Time-barred.**

Mahler has pled claims for breach of contract and breach of warranties. Breach of contract and breach of warranty claims have a four-year statute of limitations. Tex. Bus. & Com. Code §2.725(a); *see Williams v. Khalaf*, 802 S.W.2d 651, 653 (Tex. 1990) (stating that C.P.R.C. §16.004's "four-year statute of limitations . . . applies to breach of contract actions"); *Key v. Viera*, 01-07-00587-CV, 2009 WL 350602 (Tex. App.—Houston [1st Dist.] Feb. 12, 2009, no pet.) (recognizing "four-year statute of limitations applicable to common law claims of . . . breach of express warranty").

The limitations period for breach of warranty actions accrues when the goods are delivered or services are rendered. Tex. Bus. & Com. Code §2.725(b) (goods); *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 546 (Tex. 1986) (services). For breach of contract claims, accrual occurs at the time of a breach. *Via Net v. TIG Ins.*, 211 S.W.3d 310, 314 (Tex. 2006). Thus, accrual of any claims related to work on the Project occurred at the time that item of work was performed or delivered; *at the latest*, by January 31, 2008, when all work on the Project was complete and final payment made. (C.R. 152).

12

In any event, the parties agree that absent application of the discovery rule or fraudulent concealment, the limitations periods for Mahler's claims expired before this action was instituted in October 2012.

## B. The Trial Court Properly Granted Summary Judgment Rejecting Mahler's Discovery Rule Counter-defense.

Mahler's attempt to make use of the discovery rule to save its time-barred claims fails for three reasons: (1) the discovery rule does not apply to Mahler's UCC claims; (2) the parties' contract expressly precludes the discovery rule's application; and (3) as a matter of law, Mahler's alleged injuries were not inherently undiscoverable.

### 1. The Discovery Rule Does Not Apply to Mahler's UCC Claims.

Mahler has alleged both common-law and UCC warranty claims. The discovery rule is categorically inapplicable to UCC claims under the Texas Business & Commerce Code, which "generally requires suit on breach of warranty claims within four years of delivery, *regardless of when the buyer discovers defects in the goods*." *See PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 92 (Tex. 2004) (emphasis added); *Am. Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W.2d 173, 176 (Tex. App.—Houston [14th Dist.] 1989, no writ) (reciting that under Section 2.725(b), a cause of action accrues when tender of delivery is made, "regardless of the aggrieved party's lack of knowledge of the breach").

Mahler has not attempted to refute this well-settled point of law. Therefore, the discovery rule is unavailable to delay accrual of Mahler's UCC claims, which accrued when the doors and floors were tendered in 2006 and became time-barred in 2010, two or more years before Mahler filed suit. (C.R. 215, 225-26). At the absolute latest, any UCC claims had accrued by January 31, 2008, when DMAC had completed all its work on the project (C.R. 151-52), and became time-barred four years later on January 31, 2012—more than eight months before Mahler filed suit.

## 2. The Parties' Contract Eliminates the Discovery Rule.

The parties' construction contract includes the AIA General Conditions of the Contract for Construction. (C.R. 20-63). Section 13.7.1, "Commencement of Statutory Limitations Period," provides that for all work done before the date of substantial completion, "any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of substantial completion." (C.R. 61). For any breaches after the date of substantial completion, the latest possible accrual date provided under the contract is the "date of the actual commission of any act of failure to perform any duty or obligation" including the "correction of the Work or failure to correct the Work by the Contractor." (C.R. 59, 61).

14

There is no dispute that the porches, floors, and doors were all installed prior to substantial completion. (C.R. 215, 225-26; S.C.R.2 29). There is no dispute that DMAC did not make any modifications to the porch framing after substantial completion, (C.R. 241-42), and Mahler has never contended that DMAC modified the flooring or the exterior doors after substantial completion. Even assuming any of the work at issue was done after substantial completion, the last time any DMAC representative was on site at the Project was January 2008 (C.R. 151)— well over four years before Mahler filed suit in October 2012. Accordingly, in no event could Mahler's causes of action accrued late enough to avoid being time-barred.

The Texas Courts of Appeals have not construed this language in the AIA General Conditions of the Contract for Construction, but many others have. Recently, in *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal. App. 4th 1249 (Cal. Ct. App. 2013), the California court of appeals reported:

> [N]umerous out-of-state authorities have examined this same clause; and **without exception**, have concluded the **provision altered the normal rules governing accrual** of causes of action, including the delayed discovery rule, **and was valid and enforceable**.

*Id*. at 1259 (emphasis added) (assembling cases). Mahler has not and cannot provide this Court with any sound basis for departing from the tide of authority holding contracting parties to the plain language of the AIA General Conditions.

15

Instead, Mahler contends that it should not be held to its agreement because it was unsophisticated and unrepresented by counsel. This argument is unavailing on both counts. Under Texas law, a party cannot avoid enforcement of a contract simply because he chose not to have legal representation in connection with the formation of the contract. As the Texas Supreme Court recently reaffirmed, "absent fraud, misrepresentation, or deceit, one who signs a contract is deemed to know and understand its contents and is bound by its terms." *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 500 (Tex. 2015), *reh'g denied* (Sept. 11, 2015).

In addition, a long line of Texas precedent rejects Mahler's argument that it should be able to avoid enforcement of its contract because it was "unsophisticated." *See*, *e.g.*, *In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002) (contract enforceable despite alleged "gross disparity in bargaining power" and lack of "opportunity to negotiate"); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996) (enforcing agreement even "assuming unequal bargaining power between" parties); *In re Ledet*, 2004 WL 2945699 (Tex. App.—San Antonio Dec. 22, 2004, no pet.) ("Whether a party is illiterate or incapable of understanding English is not a defense to a contract."); *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007); *In re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005); *Vera v. N.*

16

*Star Dodge Sales, Inc.*, 989 S.W.2d 13, 17 (Tex. App.—San Antonio 1998, no pet.).

In signing the contract, Mahler entered into a large commercial transaction: the contract price exceeded $1.3 million. (C.R. 18).[4] Mahler must be held to the terms of the business agreement it negotiated.[5]

### 3. The Discovery Rule Does Not Apply to Mahler's Claims Because Mahler's Alleged Injuries Are Not Inherently Undiscoverable.

Even if the discovery rule were not excluded by statute and the parties' agreement, it still would not apply to any of Mahler's claims. The discovery rule applies *only* when "the nature of the injury incurred is *inherently undiscoverable*," meaning that the injury "is, by its nature, unlikely to be discovered within the prescribed limitations period *despite due diligence*." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313-14 (Tex. 2006) (emphases added).

Even if the injury is not inherently undiscoverable, the rule applies to defer accrual of a cause of action only "until the plaintiff knew or, by exercising reasonable diligence, should have known of the facts giving rise to a cause of

---

[4] Mahler's Brief emphasizes that Jorden Mahler was professionally inexperienced, but this is not especially relevant because his father, Bill Mahler, signed the contract on Mahler's behalf. Mahler has made no attempt to demonstrate how the Mahlers had the wherewithal to pay for a $1.3 commercial building but were too unsophisticated to be held to their contract.

[5] Mahler's argument that enforcement of Section 13 of the parties' contract would be against public policy is wholly unsupported by Texas law. In any event, Mahler's Brief only discusses the application of that contractual provision to eliminate a counter-defense of *fraudulent concealment*, while DMAC's contention is that the provision eliminates application of the *discovery rule*.

action." *Barker v. Eckman*, 213 S.W.3d 306, 311-12 (Tex. 2006). Once a claimant learns of an injury, the statute of limitations begins to run "even if the claimant does not yet know . . . the full extent of it." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 93–94 (Tex. 2004).

Texas courts have repeatedly held that the discovery rule should rarely be applied in breach of contract cases, "as diligent contracting parties should generally discover any breach during the relatively long four-year limitations period provided for such claims." *Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 543 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (quoting *Via Net*, 211 S.W.3d at 315); *accord Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001).

### a. The Discovery Rule Does Not Defer Accrual of Mahler's Claims Concerning the Doors and Flooring, because a Manufacturer's Basic Product Information Is Not Inherently Undiscoverable; Indeed, It Was *Actually Known* to Mahler.

Mahler's claims relating to the doors and the flooring are that they were not of the appropriate "commercial grade," that the doors were warranted only for interior rather exterior applications, and that the flooring was warranted only for residential rather than commercial use.

Accrual of these types of claims cannot be deferred by the discovery rule, which applies only to "inherently undiscoverable" injuries. Basic product information, including whether a product is "commercial grade" or is warranted for

18

particular uses, is easily discoverable through basic and routine inquiries. The owner of a commercial construction project can, and often does, participate directly in the selection and approval of materials and component products. Mahler was involved in such selection in connection with the Project. (S.C.R.2 104, C.R. 221). That alone ends the inquiry.

However, even if Mahler had not been involved in selecting the products about which it now complains, it could easily have obtained product specifications and warranty information from a variety of sources, including the contractor, the product vendor, and the product manufacturer. Texas case law makes it abundantly clear that the availability of that information to Mahler negates the discovery rule.

For example, in *Computer Associates International, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996), the Texas Supreme Court determined that an alleged trade secret misappropriation was not inherently undiscoverable where the plaintiff "*could have* detected [defendant's] theft by using document control logs—a common practice among high technology companies dependent upon trade secrets." *Id.* at 456-57; *see also HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) (details about oil and gas operations in common underground reservoir could have been obtained from the lessee or filings with the Texas Railroad Commission); *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex.

2001) ("[T]hose who receive statements listing fees charged should be alerted to the need to perform additional investigation to protect their interests.").

By the same token, the owner of a commercial construction project can (and *must*, if it wishes to avail itself of the discovery rule) protect its interests by obtaining basic information about the materials and products utilized in construction. That information *was* available to Mahler all throughout construction and through full completion of the Project in January 2008, so the discovery rule is *not*.

Finally, Mr. Mahler, Mahler's owner and manager, ***actually had <u>by 2007</u>*** all of the same information about the doors and the floors that formed the basis of the lawsuit he filed in 2012. As to the wooden doors, Mr. Mahler testified that he started to notice what he considered problems "[s]hortly after construction" in *2006*—six years before suit was filed:

> Q. And when you say construction, you mean the original construction back in 2006, right?
>
> A. **Yes, sir.**

(C.R. 225-26 (emphasis added)).

Mr. Mahler later personally contacted the vendor of the doors to obtain product information on April 9, 2007, five and a half years before filing suit. (C.R. 124, 226). In a response received the very same day, he received the door manufacturer's official product specification sheets, warranty information, and an

20

explanation from the vendor that the doors were warranted by the manufacturer only for interior use.[6] (C.R. 124-130); *see also* (C.R. 186-87) (2007 Robinson report reflecting Mahler's stated concern that doors were not intended for exterior use); (C.R. 204-05) (December 2007 email from Mahler to DMAC) ("The issue about the exterior doors being hung while they were made for 'Interior use' still bothers me."). Mr. Mahler confirmed in his deposition that the basis of his claims about the doors was fully known to him in 2007:

> Q. **Both you and DMAC were aware in 2007 that these doors didn't have a warranty if they were hung in an exterior application, right?**
>
> A. **Correct.**
>
> Q. All right. **And now it's – it's – we're here seven years later and we're part of a lawsuit about whether the doors have a warranty when they're hung in the exterior, right?**
>
> A. **Correct.**

(C.R. 232-33 (emphasis added)).

As to the floors, Mahler does not allege that he was unable to obtain the product information when the flooring was first selected in 2006. Mahler does not allege that he asked DMAC for information about the floors at all, much less that DMAC refused to provide it. "[F]ailing to even ask for such information is not due

---

[6] Incidentally, the manufacturer's warranty on the doors was good for five years if the doors were used for interior applications. (C.R. 198). By the time Mahler filed suit, the doors had already been in exterior use for roughly *six years*, meaning that even if the manufacturer warranty had applied, it would have expired well before Mahler filed this suit.

21

diligence." *Via Net*, 211 S.W.3d at 314. A party cannot wait until the limitations period has expired without ever making an inquiry and then invoke the discovery rule. Mahler could easily have contacted the flooring vendor or manufacturer—just as he did the manufacturer of the doors.

Mr. Mahler testified that he noticed wear in the flooring material in 2010, but he did not make any inquiries about the material at that time. (C.R. 220). (He admits that he already knew then that the flooring product installed by DMAC was an inexpensive composite material. (C.R. 221).) It was not until 2011, when Mr. Mahler was replacing some of the flooring with a higher-end, more expensive material that he claims he made his first attempt to learn anything about the original flooring material. (C.R. 222). When he did decide to make that inquiry, he admits that all he had to do (and all he actually did) was to find the box of excess material DMAC had left in his possession five years earlier, read the manufacturer information on the box, and make a simple phone call. (C.R. 223-23).

The bottom line is that Mahler could have discovered all of the information forming the basis of its complaints through reasonable diligence well before January 2008—the last time DMAC set foot on Project property—by availing itself of "ready source[s] of information," *HECI Expl. Co.*, 982 S.W.2d at 887, such as the manufacturer's labels and product materials containing it. Failure to do so precludes application of the discovery rule to these claims.

**b. The Discovery Rule Does Not Apply to Mahler's Claims Concerning the Porch Roofs.**

Mahler's complaints concerning the porch roofs adjoining the reception hall are that (1) certain porch-roof materials and finishing were deficient, and (2) the structural framing of the porch roofs was defective or deficient. Neither of these alleged deficiencies is inherently undiscoverable, as they are precisely the types of anomalies that can be discovered through a routine, visual inspection of a substantially complete construction project. Indeed, Mahler's claims concerning the porch roofs are clearly barred by limitations because Mahler *actually discovered* the factual basis of a claim more than five years before filing suit.

**i. The Materials and Finish Work for the Porch Roofs Were Both Discover*able* and Discover*ed* More than Four Years Before Mahler Filed Suit**

Mahler's Original Petition complains that (1) the porch roofs were covered with a "rolled roofing material" rather than a metal roof like the one installed on the primary structures; (2) flashing on parts of the porch roofs was improperly or incompletely installed; and (3) "interior paint compound" was used on the exterior porch ceilings or "soffits." (C.R. 8).

Mr. Mahler's own deposition testimony confirms that he actually discover*ed* that (1) the porch roofs were covered with a "rolled roofing material" more than four years before Mahler filed this October 2012 lawsuit:

23

Q. And **you knew at the time** that the -- that the roofs were originally -- the porch roofs were originally constructed [sometime in 2006] that they were constructed using a **rolled roof material**, right?

A. **<u>Yes</u>**.

. . . .

Q. All right. So to know what kind of material was used on the roof, **<u>all you had to do was just get up on a ladder and take a look at it</u>** and you would see that it was rolled roofing material like a tarpaper, right?

A. **<u>Correct</u>**.

(C.R. 249-50 (emphasis added)); *see also* (C.R. 180) (2007 Report noting the roofing materials used).

Mr. Mahler's own deposition testimony also confirms that he actually discover*ed* more than four years before filing this lawsuit in October 2012 the facts that allegedly give rise to Mahler's claim that (2) flashing on parts of the porch roofs was improperly or incompletely installed:

Q. And what about flashing? **Flashing, that's another thing that you can just take a look at, right? It's right out there in the open?**

A. **<u>I think so, yeah</u>**, if -- if I -- if what I think is flashing, yeah.

Q. All right. And that's something that your original inspector back in 2007 looked at, right, was flashing?

A. Yes.

(C.R. 249-50 (emphasis added)); *see also* (C.R. 174-75, 181-84) (2007 Report noting poor flashing in numerous places).

24

Finally, (3) the interior paint compound that was applied was actually discussed by the parties *before it was applied* more than four years before Mahler filed this suit. In an email dated December 29, 2007, a DMAC representative gave Mahler the option of applying a "'feather float' with ceiling texture and paint which will help hide the joints" in the soffits beneath the porch roofs. (S.C.R.2 82). This compound was applied on an exterior surface, and was open to further inspection at any time. Nothing about its use was inherently undiscoverable.

### ii. The Alleged Deficiencies in the Structural Framing for the Porch Roofs Were Both Discover*able* and Discover*ed* More than Four Years Before Mahler Filed Suit

Construction defects "noticeable upon a basic inspection" are by definition discoverable. *Wilson v. Magaro*, 01-12-00952-CV, 2013 WL 3243389, at *4 (Tex. App.—Houston [1st Dist.] June 25, 2013, no pet.). In *Wilson*, a closely analogous case, the court explained that

> The summary judgment evidence in this case establishes that [plaintiff] **discovered problems with the drywall when he 'made a periodic walkthrough'** of the residence in the late afternoon. . . . This does not establish that the alleged defects were inherently undiscoverable. To the contrary, it **establishes that the defects were noticeable upon a basic inspection with proper lighting**. Similarly, the inspector's report identified problems with the drywall . . . . All of this indicates visible and obvious problems with the drywall, not an "inherently undiscoverable" injury.

*Id.* at *4 (emphases added).

25

By Mr. Mahler's own admission, the alleged structural defects in the porch framing were detectable shortly after their construction in 2006, because they resulted in visible sag:

> Q. And at the time of this [2007 structural engineering] report, **had you personally observed the sags** and the unevenness that Mr. Robinson is describing?
>
> A. **Yes, sir**.
>
> Q. **You had already noticed it before he [the investigator] ever came out there?**
>
> A. **Yes, sir**.

(C.R. 239 (emphases added)). [7]

Mahler contends that visible sags in the porch roofs were not enough to place it on notice of the extent of the structural defects in the porch roofs. As a threshold matter, Mahler certainly had sources of information through which it could have discovered any defects in the porch roofs: Mr. Mahler is the owner of the Project, he had unfettered access to the work since its inception (including throughout the construction phase), was able to (and did) hire independent inspectors (C.R. 163-90), and has photographs of the Project under construction that reveal the structural components of the porch roofs (C.R. 192-94)—just to name a few of the sources of information that Mahler had available.

---

[7] Mahler attempts to rely on testimony from Don McIntyre to support a contention that there were no visible indications of a structural defect, Mahler's Brief at 38, but Mr. McIntyre testified clearly that he never personally observed the porch roofs. (S.C.R.3 92) ("I have no personal knowledge. I did not inspect the porch. I have no personal knowledge of that particular item.").

But more importantly, the sags in the porch roofs were precisely the conditions that Mr. Robinson, Mahler's inspector, characterized ***in 2007*** as indicative of structural deficiency. (C.R. 174-75). Mr. Robinson's 2007 professional inspection report was based on simple visual observations. Although Mr. Robinson disclaimed any attempt to find latent structural defects, he noted the sagging in the porch roof near the front under the heading "Significant Exceptions":

> The surface of the roof at the east porch off the reception building was uneven . . . . **There was <u>significant sag observed</u> over the barbeque area** outside the bar which was abnormal and **may be due to <u>structure of insufficient stiffness</u> to prevent the sag**.

(C.R. 174-75 (emphasis added)). He continued,

> It is recommended that these irregularities be further investigated by the builder to determine the **extent of <u>reinforcement necessary</u>** for the ceiling structure to **prevent further unevenness or deflections**.

*Id.* (emphasis added). In other words, Mr. Robinson's report *actually notified* Mahler that the porch roof sagging indicated a more serious structural defect. Because it was observed and reported to Mahler in 2007, any defect could not have been inherently undiscoverable.

Mahler's contention that the extent of the alleged damage was inherently undiscoverable because it would not have been apparent to his own untrained eye fails for two reasons: First, Texas precedent establishes that the discovery rule does not take into account whether expertise is required to discover an alleged defect;

27

the test is whether the information that would lead to its discovery is readily available to one who has the training to understand it.

In *BP America Production Co.*, the Texas Supreme Court held as a matter of law that the discovery rule did not apply to the plaintiffs' claim even though discovering the basis for their claim would have required an expert to understand well logs containing "highly technical information" about "resistivity, conductivity, and spontaneous potential." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 66 (Tex. 2011). Because the information that the plaintiffs' expert eventually relied upon had been available to them all along, the Court determined that the injury was not inherently undiscoverable:

> Although technical, the public documents concerning [defendant's] operations were available to the [plaintiffs]. . . . It is not significant that [defendant's] internal documents helped the [plaintiffs] discover the injury in this case, as the information was otherwise discoverable. Because the [plaintiffs] had a duty to exercise reasonable diligence in protecting their [] interests, and since the [alleged injury] could have been discovered with the exercise of reasonable diligence, the injury was not inherently undiscoverable.

*Id.* at 66-67.

Second, and more importantly, Mr. Mahler was *actually alerted* about potential structural defects by Mr. Robinson, his trained inspector, *and he has testified that he read Mr. Robinson's 2007 Report contemporaneously and understood that the inspector was flagging a structural issue. See, e.g.*, (C.R. 73-74) (Q: "**So you knew in 2007 that according to the professional engineer that**

28

**you had hired to inspect the building, that he thought maybe some further investigation should be done, right?** A. **Yes**." (emphasis added)).

The record conclusively demonstrates that Mr. Mahler had an actual subjective concern about the structure of the porch roofs well over four years before filing suit. On January 1, 2008, Mr. Mahler sent an email to a DMAC stating that it looked from pictures of the porches like a "2x4 (header) is what is attached at the building side. I'm not an expert, but looks a little weak." (C.R. 192, S.C.R.2 29). Mr. Mahler confirmed in his deposition that he was concerned at the time about a structural deficiency in the porch roofs. (C.R. 245-46). Mr. Mahler concedes that he did not receive a response to his email and did not follow-up further, (S.C.R.2 29), yet despite his concerns he did not attempt to consult an independent inspector or otherwise perform a follow-up investigation until mid-2012. (C.R. 251-52) ("Q. All right. And chose not to do an additional inspection that could have been done, right? That's right, isn't it? A. **Could have, should have, you know . . . .**")

Moreover, the affidavit submitted by *Mahler's own litigation expert*, a structural engineer, confirms that the 2007 Report had already pointed out the very same structural problems with the porch roofs that Mahler's expert further investigated when he was hired in 2012:

29

**"The sags and unevenness <u>noted in the [2007] Robinson report</u> were caused by the structural deficiencies noted in my report dated May 22, 2012** . . . ."

(S.C.R.2 10 (emphasis added)).

While Mahler's litigation expert ventures that the 2007 report's recognition of a "structure of insufficient stiffness" in the porch "amounts to approximately ten percent of the structural defects in the shed roofs that [the litigation expert] reported five years later in [his] report," (S.C.R.2 10), that is more than sufficient to start the statute of limitations running: "[After a] claimant learns of a wrongful injury . . . the limitations clock is running, *even if the claimant does not yet know . . . the full extent of it*." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 93–94 (Tex. 2004) (emphasis added); *see also Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.*, 866 S.W.2d 740, 742 (Tex. App.—Houston [14th Dist.] 1993, writ denied) ("A party *need only be aware of enough facts to apprise him of his right to seek a judicial remedy*." (emphasis added)).

Had Mahler exercised reasonable diligence and performed a follow-up examination as Mr. Robinson suggested in 2007, it would have discovered the full extent of its "injuries" in 2007, as all parties agree that any structural deficiency found in 2012 would have been there in 2007. (S.C.R.2 10). However, Mr. Mahler

frankly admitted that he did not conduct an independent follow-up investigation because he did not believe it was his responsibility to do so:

Q. All right. So you don't think that you had any responsibility to investigate what you believe were problems --

A. No.

. . .

Q. -- once you brought it up with them [DMAC], that's it?

A. Correct.

Q. **That's all you did because it wasn't your responsibility; that's your testimony**?

A. **<u>Correct</u>**.

. . . .

Q. And that's an investigation that you could have -- **<u>had you chosen to, you could have hired somebody to come out there and do that investigation right then in 2007, right</u>**?

A. **<u>Correct.</u>**

(C.R. 248-49, 252 (emphasis added)). The discovery rule does not protect a contracting party who chooses to rely solely on his counter-party to protect his interests because outside the context of a fiduciary relationship, reliance on a counter-party does not constitute "reasonable diligence." *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 887 (Tex. 1998) (expressly rejecting plaintiffs' "conten[tion] that they were entitled to rely on [defendant] to safeguard their interests" and distinguishing fiduciary from normal contractual relationships); *accord Via Net v.*

31

*TIG Insurance Co.*, 211 S.W.3d 310, 314 (Tex. 2006) (holding that "the duties the law imposes" on a counter-party "do not dispense with the need for royalty owners to exercise due diligence in enforcing their contractual rights, express or implied, within the statutory limitations period. Contracting parties are generally not fiduciaries. Thus, due diligence requires that each protect its own interests." (internal quotation omitted)).

That DMAC representatives returned to the site in 2007 following the 2007 Report to address cosmetic concerns with the ceiling panels or "soffits" *under* the porches does not negate Mahler's obligation to conduct its own investigation of the work. In any event, the summary judgment evidence demonstrates that Mahler could not have relied on DMAC to repair or reinforce the porch roof framing: DMAC never made any changes to the structure or framing of the porch roofs, and Mahler was fully aware of that fact. (C.R. 241-42). Mr. Mahler testified that DMAC never addressed the structure of the roof:

> Q. All right. DMAC came out and observed it and -- and did they add any additional reinforcement to the structure of the porch?
>
> A. I don't believe so.

(C.R. 241).

> Q. All right. Did DMAC come out and somehow conceal the roof of the porches?
>
> A. I don't believe they did anything to the roof. It was strictly underneath the porch --

Q. All right.

A. -- the soffit.

(C.R. 242). The contemporaneous documentary evidence confirms that DMAC representatives made minor cosmetic changes to the *ceiling* of the porches, but never made structural changes, and Mahler observed and understood that the work did not address structural components of the roofs. (C.R. 204-05) (December 11, 2007 email from Jordan Mahler to DMAC characterizing DMAC's follow-up work as a "daily worker guy[]" who "just went around with a box of screws and shot them into the ceiling").[8]

This undisputed evidence conclusively shows that, at the very latest, by August of 2007—over five years before the filing of this suit—the existence of a structural issue with the porch roofs was readily detectable, even on a visual inspection requiring no sophisticated methods or destructive testing. This was more than enough to start the running of the statute of limitations.

### c. Conclusion on the Discovery Rule—Inapplicable.

Because all of the alleged injuries asserted by Mahler were either visually detectible upon a basic inspection or were easily discoverable from readily

---

[8] Indeed, Mahler's litigation expert reported that during his interview of Jordan Mahler, Mahler reported that in conducting its follow-up work, DMAC had merely applied "a textured compound to the face of the soffit to cover the defects," after which the "***roof continued to leak and the sagging worsened***." (S.C.R.2 14 (emphasis added)). Taken as true, DMAC's follow-up work did not address the alleged structural defects about which Mahler was on notice, nor did DMAC ever claim that it did.

available sources of information about the materials installed in the project, the discovery rule simply has no applicability to this case.

## C. The Trial Court Properly Granted Summary Judgment over Mahler's Fraudulent Concealment[9] Counter-Defense.

The party seeking to assert fraudulent concealment as an affirmative defense to the statute of limitations has the burden to raise it in response to a summary judgment motion on limitations. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 749-50 (Tex. 1999). To satisfy that burden, the party must come forward with ***its own summary judgment evidence*** sufficient to "rais[e] a fact issue on ***each element*** of the fraudulent concealment defense." *Id.* (footnotes omitted) (emphasis added). A "mere pleading," without more, cannot satisfy that burden. *Id.*; *see also Bayou Bend Towers*, 866 S.W.2d at 746-47.

As such, Mahler had the burden of *both* pleading fraudulent concealment *and* producing sufficient summary judgment evidence on ***each*** of the following elements: that DMAC "[1] actually knew a wrong occurred, [2] had a fixed purpose to conceal the wrong, and [3] did conceal the wrong," and that Mahler "[4]

_____

[9] In a few places, Appellant's Brief mentions the doctrine of "equitable estoppel" in conjunction with the doctrine of fraudulent concealment. "Fraudulent concealment is based upon the doctrine of equitable estoppel . . . [and] estops a defendant from relying on the statute of limitations as an affirmative defense to plaintiff's claim." *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex.1983). This brief addresses both using the fraudulent-concealment framework. *See, e.g.*, *Robinson v. Ultramar Diamond Shamrock Corp.*, 01-02-00738-CV, 2003 WL 21101730, at *2 (Tex. App.—Houston [1st Dist.] May 15, 2003, pet. denied) (holding that "Robinson's equitable-estoppel defense is identical to her fraudulent-concealment defense" because both arose from the same alleged facts, and analyzing them together).

reasonabl[y] reli[ed] on [the] fraudulent representations." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011).[10] Mahler has not carried either burden.

**1. Mahler Did Not Even Plead Fraudulent Concealment with Respect to its Claims Concerning the Porch Roof Construction, Much Less Introduce Evidence Sufficient to Carry Its Burden.**

Mahler's Original Petition, which is the live pleading on appeal, pleads the discovery rule exception as to all of its claims, and pleads fraudulent concealment with respect to the doors and the flooring, but *does not plead* fraudulent concealment with respect to the porch roofs. The totality of Mahler's pleadings concerning fraudulent concealment were as follows:

FRAUDULENT CONCEALMENT

25. The accrual period related to MAHLER's causes of action should be deferred until the date MAHLER learned of, or should have discovered, the deceitful conduct or facts giving rise to the causes of action asserted herein.

26. DMAC, its agent and its representative had actual knowledge of that [sic] the doors and flooring was of a residential grade when they should have been of a commercial grade and concealed that wrong by making affirmative misrepresentations that the flooring and doors actually installed were adequate for MAHLER's commercial purpose. DMAC had a fixed purpose to conceal the wrong and knew the statements made to MAHLER were false when actually made. MAHLER reasonably relied on DMAC's, its agents and its

---

[10] The elements of equitable estoppel are similar: "[T]the doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998).

representative [sic] misrepresentations and silence causing actual damages.

(C.R. 11).[11]

Texas is a "notice pleading" jurisdiction and pleadings are usually construed liberally in favor of the pleader, "but, 'liberally' does not require a court to read into a petition what is plainly not there." *Wortham v. Dow Chem. Co.*, 179 S.W.3d 189, 199 (Tex. App.—Houston [14th Dist.] 2005, no pet.). To give fair notice, a court must be able to ascertain "from an examination of the [] pleadings alone," the elements of a cause of action or defense. *Wortham v. Dow Chem. Co.*, 179 S.W.3d 189, 198 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

There is simply no way that any reader can ascertain from the Original Petition that Mahler was alleging DMAC had fraudulently concealed or misrepresented any facts concerning that porch roof construction. In order to put DMAC on fair notice that it was being accused of making a ***misrepresentation*** concerning the porch roofs, Mahler's petition would have needed to give some indication of what was concealed or misrepresented. Mahler's petition specifically alleges misrepresentations as to two sets of claims (those concerning the doors and floors) while entirely omitting any allegation of fraud or concealment concerning the porch roofs. DMAC could not reasonably be required to infer from Mahler's

---

[11] Mahler's Original Petition also pled the related counter-defense of "equitable estoppel" with respect to the doors and floors, making similar allegations to those made in the fraudulent concealment section. (C.R. 10-11). The estoppel pleadings do not include any allegations relating in any way to the porch roofs.

allegations of misrepresentations concerning the doors and floors that Mahler also contended misrepresentations were made concerning the porch roofs.

Mahler now contends that if its Original Petition did not sufficiently plead fraudulent concealment with respect to its claims concerning the porch roofs, the Court should consider its Amended Petition, which pleads fraudulent concealment with respect to all claims.[12] Surprisingly, Mahler argues that the trial court should be *presumed* to have accepted its Amended Petition, failing to mention that the trial court expressly rejected the Amended Petition on the record after Mahler attempted to file the amendment, which pled a new cause of action in addition to the new counter-defense, one day before the summary judgment hearing without seeking prior leave from the trial court.[13] At the hearing, Judge Schaffer specifically rejected the amended pleading and made clear that his ruling on DMAC's Motion would be based on Mahler's Original Petition:

> **[DMAC's Counsel]**: The Plaintiff yesterday filed its First Amended Petition.
>
> **THE COURT**: Doesn't work. Doesn't work. I am not going on the First Amended Petition.
>
> **[DMAC's Counsel]**: Okay.

---

[12] Of course, the very fact that Mahler attempted to amend its Original Petition to expressly include a new fraudulent-concealment counter-defense as to the porch roofs betrays Mahler's claim that its Original Pleading adequately pled that counter-defense.

[13] Mahler's Brief asserts that Mahler sought leave to file its amendment, but it did so *after* the summary judgment hearing, at which the trial court had already refused the amendment. (S.C.R.33).

37

**THE COURT**: **I'm not even looking at it**. The Rules are clear that I go -- my burden or my duty is to look at what was in the file seven days out. And that absent leave to file an Amended Petition --

. . . .

**THE COURT**: No. Summary Judgment it requires you -- in a Motion for Summary Judgment you're required to stand on the Pleadings seven days out. You don't get to replead one day out and change the whole nature of the case.

(R.R. 31:8-14, 19-22).[14]

Accordingly, Mahler's reliance on *Goswami v. Metro. Sav. & Loan Ass'n*, 751 S.W.2d 487 (Tex. 1988), is misplaced. In *Goswami*, "the record [gave] no indication that the trial court refused leave to file nor [did] it contain a motion to strike the amended petition." *Id.* at 490. Here, on the other hand, the record clearly demonstrates that DMAC immediately objected and asked the court to strike the untimely amendment, (C.R. 307-08), and that the court in fact did strike it, (R.R. 31). The presumption in *Goswami* that the amendment was considered was predicated entirely on the fact that "the record is silent of any basis to conclude that the amended petition was not considered by the trial court," 751 S.W.2d at 490, which makes it wholly inapposite to the present case. (R.R. 31:8-14, 19-22) ("I'm not even looking at it.").[15]

---

[14] Mahler's Brief incorrectly states that the record does not reflect whether the trial court considered the amended pleading. Mahler had not requested preparation of the Reporter's Record at the time it originally filed its Brief.

[15] Mahler's Brief to this Court failed to even acknowledge the trial court's bench ruling; accordingly, Mahler has waived any argument that the ruling was somehow in error.

**2. Even if Mahler Had Properly Pled Fraudulent Concealment Concerning the Porch Roofs, DMAC's Motion for Summary Judgment Refuted an Element of that Counter-Defense as a Matter of Law.**

Fraudulent concealment tolls the statute of limitations only until a plaintiff either learns the truth or has "[k]nowledge of facts, conditions, or circumstances which would cause a reasonable person to make inquiry leading to the discovery of the concealed cause of action." *Bayou Bend Towers*, 866 S.W.2d at 747. Once a plaintiff acquires that knowledge, it can no longer meet the "reasonable reliance" element necessary to sustain a fraudulent concealment counter-defense.

In *Bayou Bend Towers*, this Court, affirming summary judgment on limitations grounds, determined that summary judgment evidence demonstrating a plaintiff either knew or should have known of facts giving rise to a cause of action is sufficient to defeat *both* the discovery rule *and* fraudulent concealment:

> [W]e have already determined [in the discovery rule context] that [plaintiff] had notice of facts sufficient to terminate any estoppel effect of fraudulent concealment. Knowledge of facts, conditions, or circumstances which would cause a reasonable person to make inquiry leading to the discovery of the concealed cause of action is in the law equivalent to knowledge of the cause of action for limitation purposes.

866 S.W.2d at 747.

As detailed above in Section B.3.b, it is *undisputed* that by the end of 2007, Mahler (1) had personally observed sagging in the porch roofs, (C.R. 239); (2) had obtained a professional inspection report giving it actual notice of structural defects

in the porch roofs, (C.R. 163, 240-41); and (3) had a subjective concern about the porch roof framing, (C.R. 193-94, 245-46). By that point in time, Mahler was on sufficient notice as a matter of law that it was charged to "make inquiry leading to the discovery of [any] concealed cause of action." *Bayou Bend Towers*, 866 S.W.2d at 747.

Thus, even if Mahler's Original Petition is construed to have pled fraudulent concealment as to the porch roofs (it did not), and even if this Court were to consider Mahler's eleventh-hour Amended Petition that Judge Schaffer refused to consider as untimely (it should not), DMAC's Motion cited to all of this evidence, specifically arguing that any defects in the porch roofs had *actually* been discovered more than five years before suit was filed. (C.R. 139-41). DMAC's Motion also cited the applicable legal standards for fraudulent concealment, including the principle that "[f]raudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence." *BP Am. Prod. Co.*, 342 S.W.3d at 68. (C.R. 146). Under any scenario, DMAC's Motion negated Mahler's fraudulent-concealment counter-defense as to the porch roofs.

**3. The Summary Judgment Evidence Conclusively Demonstrates that DMAC Never Misrepresented or Concealed Any Information about the Floors or the Doors.**

Mahler also contends that its counter-defense of fraudulent concealment saves its claims as to the floors and doors from being time barred. This contention is refuted by the uncontroverted summary judgment evidence—particularly Mr. Mahler's own testimony—that DMAC never concealed or misrepresented any information about these items.

During his deposition, Jordan Mahler specifically denied that anyone ever represented the doors as being "commercial grade" or "exterior grade":

Q. And did anybody ever tell you -- **anybody with DMAC ever tell you these doors are commercial grade?**

A. **No**.

Q. They never told you that, right?

A. No.

Q. All right. And did they -- **did anybody with DMAC ever tell you these doors are warranted for use in an exterior application?**

A. **No**.

…

Q. Yeah. It's true, isn't it, that **nobody at DMAC ever lied to you about the doors or the floors, right?**

A. **Correct**.

41

(C.R. 254-55 (emphasis added)).[16]  In addition to Mahler's fatal admissions, the remaining evidence demonstrates that, far from being concealed, the issue of the doors being intended for interior use was repeatedly the subject of open discussion between the parties in 2007. (C.R. 204-05).  This evidence and Mr. Mahler's admissions that DMAC never made affirmative misrepresentations about the doors conclusively negate the counter-defense of fraudulent concealment on that issue.

Moreover, nothing about the flooring was misrepresented or concealed. Neither Mahler's Brief nor its summary judgment evidence identifies any false statement concerning the floors.  Mahler was fully aware that the selected flooring was an inexpensive composite material, not high-end hardwood. (C.R. 221). Mahler does not allege that it ever asked DMAC for information about the floors. Far from concealing information about the floors, DMAC simply left the excess flooring material in a box bearing the manufacturer's contact information on site in Mr. Mahler's possession upon completion of the job (C.R. 222-23). As Mr. Mahler

---

[16] Mahler attempts to avoid the impact of these admissions only be nakedly disavowing the sworn testimony of its sole witness. *See* Mahler's Brief at 58. Mahler's counsel cannot generate a genuine issue of material fact by calling its client's sworn testimony "mistaken." *See Farroux v. Denny's Restaurants, Inc.*, 962 S.W.2d 108, 111 (Tex. App.—Houston [1st Dist.] 1997, no pet.) ("Parties are not free to disavow unequivocal testimony in an attempt to avoid summary judgment. A party cannot file an affidavit to contradict his own deposition testimony without any explanation for the change in the testimony, for the purpose of creating a fact issue to avoid summary judgment. If a party's own affidavit contradicts his earlier testimony, the affidavit must explain the reason for the change. Without an explanation of the change in the testimony, we assume the sole purpose of the affidavit was to avoid summary judgment. As such, it presents merely a 'sham' fact issue.").

42

testified, as soon as he wanted to inquire about the flooring specifications, all he had to do was find the manufacturer's information on the box on his property and make a quick phone call. (C.R. 222-23).

Faced with these fatal admissions, Mahler asks the Court to create a new duty of disclosure between contracting parties that Texas courts have roundly rejected. *See, e.g.*, *Via Net*, 211 S.W.3d at 314; *PPG Indus.*, 146 S.W.3d at 98; *Bayou Bend Towers*, 866 S.W.2d at 747. Only in the context of a fiduciary relationship is mere non-disclosure sufficient to support the counter-defense of fraudulent concealment. *Bayou Bend Towers*, 866 S.W.2d at 747 ("[Defendant] owed [plaintiff] no duty to disclose [construction defects] because there was no fiduciary relationship between the parties." (emphasis added)); *PPG Indus., Inc.*, 146 S.W.3d at 98 ("[M]ere silence is not fraudulent unless there is a duty to disclose; no such duty existed between these contracting corporations."). Contracting parties are obligated to protect their own interests, including by using reasonable diligence to confirm the compliance of counter-parties. *HECI Expl. Co.*, 982 S.W.2d at 887.

Mahler relies on *Booker v. Real Homes, Inc.*, 103 S.W.3d 487 (Tex. App.—San Antonio 2003) *as clarified on denial of reh'g* (Feb. 26, 2003), for the proposition that a builder has a duty to disclose to a laymen in a construction defect case, (Mahler's Brief at 57-58). Perhaps Mahler did not read that case to the end:

43

on rehearing, the San Antonio court of appeals specifically amended its opinion to clarify that it rested not just on a duty of disclosure, but on the defendant's *affirmative misrepresentations*. *Id.* at 494. Mahler has identified no such misrepresentations here, nor can it.

### 4. Even if DMAC Had Made a Misrepresentation About the Floors or the Doors (It Did Not), Fraudulent Concealment Would Be Unavailable to Toll Limitations Because the Relevant Facts Could Have Been Discovered Through Reasonable Diligence.

"Fraudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence." *BP Am. Prod. Co.*, 342 S.W.3d at 67.[17] For the reasons stated in Section B.3.a above, Mahler either knew or should have discovered through reasonable diligence any injury relating to the doors and floors well over four years before it filed this suit.

As explained above, the product and warranty information for the floors and doors was always readily available; Mahler knew how to make inquiries of the vendors or manufacturers of those products; and Mahler did in fact obtain the relevant information as soon as it made inquiries. (C.R. 196-202, 222-23).

Mahler counters that whether it failed to exercise reasonable diligence is necessarily a fact issue. This position is unsupported by the applicable case law

---

[17] Similarly, equitable estoppel applies only where "a party without knowledge *or the means of knowledge* of the real facts" relies on a false representation or concealment. *Medina v. Tate*, 01-12-00496-CV, 2013 WL 3421973 (Tex. App.—Houston [1st Dist.] July 9, 2013, no pet.) (emphasis added).

44

from this Court and the Texas Supreme Court. Mahler's evidence of reasonable diligence is woefully lacking even compared to other plaintiffs whose claims have been held barred as a matter of law.

For example, in *Bayou Bend Towers*, the plaintiffs conducted numerous independent investigations and hired at least four different consulting and engineering firms to investigate their claims, but these investigations failed to disclose the actual cause and party responsible for the defects. 866 S.W.2d at 743-45. This Court still held that plaintiff's claims were time barred *as a matter of law*:

> It is clear that *even if Bayou Bend did not actually discover the cause* of its leakage problem until January 1990 as it asserts, *it should have discovered the nature of its injury years earlier by the use of reasonable diligence*.

*Id.* at 744 (emphasis added).

Similarly, in *BP America Production Co.*, the Texas Supreme Court held in the face of a jury finding of fraudulent concealment that, *as a matter of law*, plaintiffs had not acted with diligence to discover the truth within the limitations period, and could not therefore rely on the fraudulent concealment doctrine. 342 S.W.3d at 69. Even though discovering the basis for their claim would have required them to hire an expert who understood well logs containing "highly technical information" about "resistivity, conductivity, and spontaneous potential," the information was available to the plaintiffs from a source other than the

45

defendant, which was sufficient to defeat any claim of fraudulent concealment. *Id.* at 66 & 67-68.

By the standard articulated in these cases, Mahler clearly failed to exercise reasonable diligence by failing to avail itself, within the limitations period, of the readily available sources of information about the floors and the doors. Even if DMAC had made contrary representations (it did not), they would not excuse Mahler's failure to exercise reasonable diligence.

**5. Mahler Did Not Rely on Any DMAC Representations Concerning the Doors or Floors, and Any Reliance Would Have Been Unreasonable.**

Even if DMAC had made a false representation about the floors or the doors (it did not), limitations was not tolled past the time that Mahler was capable of discovering the truth itself, because "reliance is not reasonable when information revealing the truth could have been discovered within the limitations period." *See BP Am. Prod. Co.*, 342 S.W.3d at 68.[18]

---

[18] Plaintiff disagrees with DMAC's contention that "reliance is not reasonable when information revealing the truth could have been discovered within the limitations period." *See* Plaintiff's Brief at 49, n. 16, but this statement is a direct quote from the Texas Supreme Court. *BP Am. Prod. Co.*, 342 S.W.3d at 68. Mahler's contention that reliance is only unreasonable when information is available in the public record has been rejected by the Supreme Court. *Id*. at 67-68 ("[I]f the Marshalls could have discovered BP's wrongdoing by reviewing information available in the public record, *or through means other than BP's representations* before limitations expired, they did not exercise reasonable diligence in relying on BP's representations and limitations barred their claim." (emphasis added)); *see also Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex. 2001) ("[Plaintiffs] cite *HECI* to support their argument that information must be publicly available to be inherently discoverable, but their reliance on that case is misplaced. Although we noted in *HECI* that information about the oil reservoir was available from several sources, including public records at the Railroad Commission, it does not

It is well documented that Mahler did *not* rely on anything DMAC said about the floors or the doors. Mahler paid independent professional inspectors to examine the Project and report on its condition (C.R. 163-90), specifically requesting that those inspectors opine on the suitability of the doors. (C.R. 186-87). He also made inquiries of the vendor of the doors, obtaining the manufacturer's product information and spec sheets and an explanation of the doors' warranty. (C.R. 196-202). Moreover, by December of 2007 at the latest, Mr. Mahler was clearly no longer relying on DMAC's statements because he was already accusing DMAC of having misled him about the doors. (S.C.R.2 78).[19]

Possessed of the manufacturer's specifications and warranty information, an independent inspector's report, with an open line of communication to its vendors, and already expressing mistrust of its contractual counter-party, any continued reliance on DMAC's representations about the doors beyond December 2007 would have been objectively unreasonable.

---

follow, and we did not imply, that an injury is inherently undiscoverable if it cannot be detected by examining public records.").

[19] Mahler has never identified any allegedly false or misleading statements concerning the floors.

47

**6. The Trial Court Properly Granted DMAC's No-Evidence Motion on Fraudulent Concealment Because Mahler Failed to Meet its Burden to Produce Evidence Supporting Each Element of its Counter-Defense.**

Mahler contends that the trial court erred in granting its no-evidence motion for summary judgment because the Motion lacked sufficient specificity. DMAC's Motion *did* specify particular elements of fraudulent concealment for which Mahler has no evidence,[20] but Mahler's argument misapprehends the parties' respective burdens. DMAC was not obligated to affirmatively disprove Mahler's affirmative counter-defenses to the statute of limitations (though DMAC has done so); rather, Mahler had the burden, in response to DMAC's limitations Motion, to present evidence supporting each of its defenses to limitations. *See KPMG Peat Marwick*, 988 S.W.2d at 749-50; *Bayou Bend Towers*, 866 S.W.2d at 746-47. Because Mahler failed to do so, the trial court properly granted no-evidence summary judgment against Mahler's fraudulent concealment and equitable estoppel counter-defenses.

Mahler failed to carry its burden of presenting *any* summary judgment evidence to support two essential elements of its affirmative counter-defense: that DMAC "had a fixed purpose to conceal the wrong," and "did conceal the wrong"

---

[20] DMAC's Motion stated: "With respect to the floors, Mahler has no evidence either (1) that DMAC had any knowledge concerning their grade or quality since they were chosen by Mahler working with a third-party flooring vendor or (2) that DMAC concealed or misrepresented anything. With respect to the doors, Mahler has no evidence of concealment or misrepresentation, because all information concerning their quality and manufacturer warranty was known equally and discussed openly by the parties." (C.R. 143).

48

with respect to Mahler's claims concerning the floors and doors. *Shell Oil Co.*, 356 S.W.3d at 927.[21]

There is no evidence that DMAC intended to, or did, conceal any facts about the floors or the doors. As discussed above, far from trying to hide any facts about the flooring, DMAC simply left the remaining flooring material in a box bearing the manufacturer's information on Mahler's property at the end of the job—not the actions of a party with a "fixed purpose to conceal." (C.R. 222-23). A DMAC representative referencing a tight construction budget in reference to the floors, *see* Mahler Brief at 57, is not evidence of fraud or an intent to conceal material facts from Mahler—budget restraints are a legitimate consideration in making material choices.

Moreover, Mr. Mahler's own testimony confirms that DMAC made no misrepresentations about the floors or doors. (C.R. 254-56). And even if DMAC had intended to conceal information about the doors, there is no evidence it actually succeeded in doing so, since Mr. Mahler obtained all of the relevant information about them in April 2007. (C.R. 124-30, 226).

---

[21] Similarly, Mahler failed to present any evidence to support the following elements of equitable estoppel: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts." *Johnson & Higgins of Texas, Inc.*, 962 S.W.2d at 515-16.

49

# CONCLUSION

For the reasons set forth above, the judgment of the trial court should be affirmed.

Respectfully submitted,

**REYNOLDS FRIZZELL LLP**

By: */s/ James A. Schuelke*
Brandon T. Allen
State Bar No: 24009353
James A. Schuelke
State Bar No: 24075037
Drew D. Pennebaker
State Bar No: 24083645

1100 Louisiana Street, Suite 3500
Houston, Texas 77002
Telephone: (713) 485-7200
Facsimile: (713) 485-7250
ballen@reynoldsfrizzell.com
jschuelke@reynoldsfrizzell.com

**COUNSEL FOR APPELLEE
DMAC CONSTRUCTION, INC.**

# CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this Brief contains 11,635 words, excluding the words not included in the word count pursuant to Texas Rule of Appellate Procedure 9.4(i)(1). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ *James A. Schuelke*
James A. Schuelke

# CERTIFICATE OF SERVICE

As required by Texas Rules of Appellate Procedure 6.3 and 9.5, I certify that I have served this document on all parties on December 9, 2015 via e-filing and/or e-mail.

Jeffrey J. Tompkins
jeffrey.tompkins@jefftompkinslaw.com
1413 Brittmoore Road
Houston, Texas 77043
(713) 787-5333

Christopher D. Nunnallee
chrisnunnallee@yahoo.com
1413 Brittmoore Road
Houston, Texas 77043
(713) 787-5333

/s/ *James A. Schuelke*
James A. Schuelke